Dekeitric Laron LEWIS, Appellant,

v.

STATE of Alaska, Appellee.

No. A–9867.

Court of Appeals of Alaska.

Nov. 7, 2008.

Josie Garton, Assistant Public Defender, and Quinlan Steiner, Public Defender, Anchorage, for the Appellant.

James Fayette, Assistant Attorney General, Office of Special Prosecutions and Appeals, Anchorage, and Talis J. Colberg, Attorney General, Juneau, for the Appellee.

Before: COATS, Chief Judge, and MANNHEIMER and STEWART, Judges.

## OPINION

MANNHEIMER, Judge.

The defendant in this case, Dekeitric Laron Lewis, was charged with several counts of assault: third-degree assault against two of his family members (his mother and his sister), third-degree assault against a police officer who came to their aid, and fourth-degree assault against a second police officer.

Lewis is chronically mentally ill, but his attorney announced that Lewis did not wish to claim insanity or even to claim that his mental disease or defect negated a culpable mental state needed to prove third-degree assault.

Under AS 12.47.070(a), a court is authorized to order psychiatric evaluations of the defendant, and to disclose the results of these examinations to the State, in four circumstances. A court can do this if:

- the defendant has filed notice of an intent to rely on the defense of insanity; or
- the defendant has filed notice of an intent to argue that, because of mental disease or defect, the defendant lacked

one or more culpable mental states that are elements of the crime(s) charged; or

- there is reason to doubt the defendant's mental competence to proceed; or
- there is reason to believe that a mental disease or defect of the defendant "will otherwise become an issue in the case".

Lewis's case involves this fourth clause of AS 12.47.070(a). The major issue in this appeal is whether, even though Lewis announced that he would not argue for acquittal based on mental disease or defect, the superior court nevertheless had the authority—under this fourth clause of AS 12.47.070(a)—to order psychiatric evaluations of Lewis, to allow the State to introduce the results of those evaluations, and to instruct the jury on the possibility of returning a verdict of "guilty but mentally ill".

As we explain here, the superior court correctly perceived that even though Lewis claimed not to have raised the issue of his mental health, Lewis did in fact raise this issue. Because Lewis raised this issue, the superior court acted properly when it ordered psychiatric evaluations of Lewis, when it allowed the parties to introduce evidence of the results of those evaluations, and when it instructed the jurors on the possible verdict of "guilty but mentally ill".

*Underlying facts*

Prior to the episode involved in this case, Lewis had been diagnosed as suffering from schizo-affective disorder with manic tendencies, as well as antisocial personality disorder. He also has borderline intellectual functioning.

Lewis had been prescribed medication for his disorders, and that medication was effective: it stabilized his thinking and his emotions—when Lewis chose to take the medication.

On November 12, 2004, Lewis was released from custody stemming from a separate matter. Upon his release, he stopped taking his medication. Four days later, Lewis got into an altercation with his mother and sister after he learned that his sister was pregnant. During this altercation, Lewis pulled a knife and asked his sister and mother if they were sure that he would not hurt them. Lewis's sister managed to get away and call the police.

When the police arrived, they found Lewis to be extremely agitated. Lewis told the officers that he would hurt everybody if they threatened him. After backup officers arrived, Lewis was taken into custody.

Based on this episode, Lewis was charged with three counts of third-degree assault for threatening his sister, his mother, and Officer Earl Ernest. He was also charged with fourth-degree assault upon another police officer.

When Lewis appeared in court on January 14, 2005 following his indictment, he was obviously mentally disturbed. A representative from the Department of Corrections explained that Lewis had been refusing to take his medications. Based on Lewis's behavior in court, Superior Court Judge Michael L. Wolverton ordered a competency evaluation.

Clinical and forensic psychologist David J. Sperbeck evaluated Lewis and found that he lacked competence to proceed. As a result, Judge Wolverton delayed the criminal proceedings to see if Lewis could be restored to competency.

On February 28, 2005, the parties appeared in court again. Apparently, Lewis had responded well to treatment, and Dr. Sperbeck now concluded that Lewis was competent to proceed. Lewis's attorney announced that she and her client agreed with this assessment, and that they wanted the criminal proceedings to go forward. During the ensuing discussion of future court dates, both Judge Wolverton and the prosecutor stated that, according to their calculations, the time for bringing Lewis to trial under Alaska Criminal Rule 45 would expire on April 30, 2005. Lewis's attorney made no objection to either the prosecutor's or the judge's statements.

*The facts pertaining to Judge Card's April 2005 order for further psychiatric evaluations of Lewis, and the facts pertaining to Lewis's later claim that the time needed for these evaluations should be counted against the State when calculating the time for bringing Lewis to trial under Alaska Criminal Rule 45*

As we explain in more detail below, the key superior court ruling in this case was an order issued on April 25, 2005—an order issued pursuant to AS 12.47.070(a), directing that Lewis be examined by two psychiatrists or forensic psychologists.

This order gave rise to Lewis's three claims on appeal: (1) the claim that the superior court acted illegally when it ordered these psychiatric examinations; (2) the claim that the time needed to accomplish these evaluations should have been counted against the State when calculating the time for bringing Lewis to trial under Alaska Criminal Rule 45; and (3) the claim that Lewis's rights under the Fifth Amendment were violated when, at his trial, information obtained during these psychiatric evaluations was presented to the jury.

Because these claims are so intertwined, it would be difficult to write three distinct statements of facts discussing these claims without considerable redundancy. Thus, what follows is a fairly detailed description of the procedural history of Lewis's case, beginning in April 2005 and ending with his eventual trial in March 2006.

*The pre-trial conference of April 21, 2005 in front of Judge Wolverton*

Lewis's trial was scheduled to begin on April 18, 2005, but the trial had to be delayed because his defense attorney became ill. Superior Court Judge Michael L. Wolverton held a pre-trial conference on April 21, 2005 to see when Lewis's trial could begin.

The defense attorney informed Judge Wolverton that she needed one week to research an issue that had recently come up. The problem, according to the defense attorney, was that the prosecutor had been talking about having the jury decide whether Lewis was "guilty but mentally ill" as defined in AS 12.47.030.

The defense attorney told the judge that she interpreted AS 12.47 to mean that the State could not introduce any evidence pertaining to a defendant's mental health, or seek a "guilty but mentally ill" verdict, unless the defendant affirmatively raised a defense based on mental disease or defect.

The defense attorney also told Judge Wolverton that Lewis was personally opposed to any further delay, and that he wanted to begin his trial on the following Monday—that is, on April 25, 2005. But the defense attorney declared that she needed more time to research and file "protective orders on the psychological information".

In response, the prosecutor explained that she thought a "guilty but mentally ill" verdict choice was needed because, without evidence of Lewis's mental health problems, and evidence that Lewis had stopped taking his medication, it would be impossible for Lewis's mother and sister to fully explain why they were afraid that Lewis would injure them.

The prosecutor further pointed out that, under AS 12.47.060(a), the issue of whether a defendant should be found "guilty but mentally ill" can be raised by either party, or by the court itself, if the defendant is convicted but the jury does not decide this issue. Thus, the prosecutor explained, as a practical matter, the choice was either to have the jury consider a "guilty but mentally ill" verdict at Lewis's trial or, instead, to have the court consider this matter in a post-conviction hearing (assuming that Lewis was convicted).

In rebuttal, the defense attorney repeated her position that she interpreted the provisions of AS 12.47 to mean that evidence of a defendant's mental disease or defect is not admissible at a criminal trial unless *the defendant* gives advance notice of an intent to rely on mental disease or defect to establish insanity or to negate a culpable mental state. In other words, if the defendant has not raised the issue, the State is barred from introducing evidence of the defendant's mental disease or defect.

When Judge Wolverton declared that he would set a trial call for May 16, 2005—apparently, to give the parties time to brief this issue and to accommodate the schedules of the judge and the attorneys—the defense attorney objected that Rule 45 would expire by then. So Lewis's case was called for trial before Superior Court Judge Larry D. Card on the date that Lewis (personally) wanted: Monday, April 25, 2005.

*The aborted trial proceedings of April 25, 2005—and Judge Card's order directing further psychiatric evaluations of Lewis*

Although the parties assembled for trial on April 25, 2005, Lewis's trial did not go forward that day. Instead, Judge Card issued the ruling that lies at the center of this appeal: he continued the trial and ordered further psychiatric evaluations of Lewis.

At the beginning of the April 25th proceeding, both the prosecutor and the defense attorney announced that they were ready for trial. However, the prosecutor then added that she would be seeking an alternative verdict of "guilty but mentally ill".

The prosecutor conceded that Lewis had given no notice that he intended to plead insanity or to rely on mental disease or defect to negate a culpable mental state. Nevertheless, the prosecutor told Judge Card that she believed that the existence of a mental illness "[was] central to this case"— that Lewis's poor mental health was a circumstance that would "infuse[ ] all of the testimony of [Lewis's] mother and sister, who were fearful, in part, because Mr. Lewis had not been taking his medication".

The prosecutor told Judge Card that she did not intend to present any expert testimony on the subject of Lewis's mental condition. Instead, she intended to rely solely on the lay testimony of Lewis's mother, who was personally familiar with his mental health problems.

In response, the defense attorney repeated her contention that AS 12.47 precluded *any* evidence of a criminal defendant's mental disease or defect—whether that evidence took the form of expert testimony or lay testimony—unless the defense gave notice that it would raise a defense of insanity or, alternatively, that it would claim that the defendant's mental disease or defect negated one or more of the culpable mental states required for the crime.

Lewis's attorney asserted that Lewis had not alleged either of those things. So, according to the defense attorney, the State was precluded from introducing any evidence of Lewis's mental disease or defect. And without such evidence, the defense attorney

reasoned, it would be improper to instruct the jury on the verdict alternative of "guilty but mentally ill".

The defense attorney conceded that there was one way in which Lewis's defense would relate to his mental condition, and to how Lewis's mental condition might make a difference to the jury's assessment of whether Lewis acted "intentionally" or "recklessly" during the episode being litigated. But the defense attorney contended that this defense did not pertain to Lewis's underlying mental diseases or defects.

Rather, the defense attorney declared, Lewis's defense would be based on evidence that, at or near the time of the November 2004 episode, Lewis's father might have given him Neurontin—a psychotropic drug that had not been prescribed for Lewis—in an attempt to abate Lewis's symptoms. The defense attorney implied that she would argue to the jury that Lewis's behavior during the November 2004 episode suggested that he had lost touch with reality as a result of ingesting this drug.

The defense attorney conceded that, even if she was correct that the State could not introduce evidence of Lewis's mental diseases or defects at trial, the question of whether Lewis should be found "guilty but mentally ill" would still arise if Lewis was convicted. In that case, the defense attorney acknowledged, AS 12.47.060 would allow the State to bring up the issue of Lewis's mental illness in a post-verdict proceeding to determine whether the verdict should be amended to "guilty but mentally ill". Nevertheless, the defense attorney argued that, from the wording of the various provisions of AS 12.47, it was clear that the Alaska Legislature did not want this issue to be presented to a trial jury unless the *defendant* opened the door by affirmatively relying on mental disease or defect to establish insanity or to negate a culpable mental state.

After hearing the parties' arguments, Judge Card concluded that, despite the State's expressed desire to go forward without expert testimony, he was obliged by the fourth clause of AS 12.47.070(a) to delay Lewis's trial and to order further psychiatric

evaluations of Lewis. Judge Card believed that this result was dictated by the statute because, given the points of contention between the parties, there was "reason to believe that a mental disease or defect of the defendant [would] otherwise become an issue in the case".

Judge Card declared that he did not see how Lewis's case could be litigated without evidence pertaining to Lewis's mental health—because Lewis's mother or sister would inevitably refer to Lewis's mental problems and his failure to take his medications. Judge Card also stated that "the public [is] entitled to justice here, also"—assumedly meaning that Lewis's trial could not be fair without this information. For these reasons, Judge Card ordered that Lewis be separately examined by two psychiatrists or forensic psychologists (as required by AS 12.47.070(a)).

After Judge Card issued this ruling, Lewis's attorney told the judge that she did not really object to his decision:

> *Defense Attorney:* Your Honor, I agree that, if the court is making a determination that mental illness essentially will become an issue in the case, then I think that that's a fair decision to make, . . . and the [basis of the] court's decision is clear in the statute.

The defense attorney's non-objection to the renewed psychiatric evaluations was also evidenced four days later (on April 29, 2005), at a status hearing held in front of Judge Wolverton. At that hearing, Judge Wolverton declared that the time for bringing Lewis to trial under Criminal Rule 45 would be tolled pending the completion of these psychiatric evaluations ordered by Judge Card. Lewis's attorney offered no objection to Judge Wolveton's pronouncement.

*Dr. Sperbeck's evaluation of Lewis*

Three weeks later, on May 17, 2005, pursuant to Judge Card's order, Dr. Sperbeck submitted an updated psychiatric evaluation to the superior court.

In his May 17th report, Dr. Sperbeck told the court that Lewis had been "extremely suspicious and guarded" when Sperbeck interviewed him, and that it was "difficult for [Dr. Sperbeck] to determine with any degree of reliability [Lewis's] state of mind at the time of the offense[,] due to his uncooperativeness."

From Dr. Sperbeck's report, it appears that Lewis told him only one thing of substance about the assaults. As reported by Sperbeck, Lewis said: "I took some Neurontin right before I got arrested. . . . My father made me take it. . . . The Neurontin affected my memory. . . . I don't remember what happened."

Although Dr. Sperbeck could offer no opinion on Lewis's state of mind at the time of this episode, he did tell the court that "[i]t is highly unlikely that [Lewis's] statement that a dosage of Neurontin affected his memory is a valid explanation for his refusal to discuss . . . his state of mind at the time of the crime charged." Dr. Sperbeck believed that it was more likely that Lewis had stopped taking his medications at the time of this episode—and that, as a result, Lewis became "acutely psychotic and manic".

*The proceedings in front of Judge Wolverton on July 28, 2005*

Despite Dr. Sperbeck's promptness in responding to Judge Card's order, the judge's order remained unfulfilled for the next two months—because no *second* psychiatrist or forensic psychologist examined Lewis. The parties returned to court on the afternoon of July 28th, in front of Judge Wolverton, to report this fact.

Lewis's attorney took the lead role in explaining the situation to Judge Wolverton. Again, her remarks contain no indication that she objected to any aspect of Judge Card's earlier order:

> *Defense Attorney:* I believe [the prosecutor] and I agree that [Judge Card's] order [of] 4/25 . . . was for *two* psych evals. And that may have been unclear to A.P.I. [*i.e.,* the Alaska Psychiatric Institute]. . . . We've only received one report, from Dr. Sperbeck. [The absence of the second evaluation] appears, at this point, to be an oversight. And I think we need to redirect A.P.I. to have a second evaluation of Mr. Lewis. . . .

Judge Card ordered [these two evaluations] under [AS] 12.47.070, under the theory that if it becomes clear to the court that mental disease or defect will otherwise become an issue in the case, the court must—the court shall order these two exams. And I believe that that's where we are.

Because Judge Wolverton was going to be away from work during the month of August, he asked the two attorneys to "draft another stipulation for an order" requiring the second psychiatric evaluation. The judge then asked the parties for their suggestions regarding further court proceedings. When Judge Wolverton suggested a pre-trial conference in September (when he returned to work), the defense attorney replied, "That's definitely possible."

Then, when Judge Wolverton suggested that it might make more sense to hold the proceedings in front of Judge Card, and when the in-court clerk reported that Judge Card had set aside August 24th for pre-trial conferences, the defense attorney replied, "That's fine."

The defense attorney then addressed the issue of Rule 45. Her remarks indicate that she believed that Rule 45 was currently tolled, but that the rule should perhaps start running again, now that the psychiatric evaluation process was taking so long:

> *Defense Attorney:* Your Honor, my client has ... requested that I make an inquiry about Rule 45. My understanding from Judge Card's order was that Rule 45 would be tolled during the pendency of this [psychiatric] evaluation process. However, it is taking longer than we expected.

> *The Court:* ... That's clearly what [Judge Card's] order said. And I reviewed the log notes, [which are] to that effect.... So I'm going to direct any further inquiry about Rule 45 to Judge Card— because ... the case is going [to him]....

> *Defense Attorney:* Okay. So we'll bring it up with Judge Card ... when we go to court.

The second psychiatric evaluation was submitted to the superior court on August 16, 2005—thus completing the steps required by Judge Card's order.

> *The pre-trial conference held before Judge Card on August 24, 2005; the motion to dismiss for violation of Criminal Rule 45; the ensuing motions to suppress the results of the psychiatric evaluations and to preclude the jury from returning a "guilty but mentally ill" verdict; Judge Suddock's rulings on these motions*

As explained above, a pre-trial conference in Lewis's case was held on August 24, 2005 in front of Judge Card. On that day, a new attorney (another assistant public defender) entered a superseding entry of appearance for Lewis, and this new attorney appeared for Lewis at the pre-trial conference.

Lewis's new attorney told Judge Card that he believed he had a valid motion to dismiss Lewis's case under Rule 45. Judge Card tentatively scheduled Lewis's trial for November 14, 2005, with the understanding that trial would be delayed if the defense attorney filed the proposed Rule 45 motion.

One week later (on September 2nd), Lewis's new attorney filed the anticipated Rule 45 motion. In this motion, Lewis's attorney contended that Rule 45 continued to run— and expired—during the time that was needed to conduct the psychiatric evaluations ordered by Judge Card on April 25th.

Lewis's attorney conceded that, normally, Rule 45 stops running for the time needed for psychiatric evaluations of a defendant. However, the defense attorney argued that there should be no tolling of Rule 45 in Lewis's case because (according to the new defense attorney) Judge Card ordered the psychiatric examinations over defense objection (*i.e.*, over the objection of Lewis's former defense attorney) to accommodate the State's desire to pursue a verdict of "guilty but mentally ill".

In early December 2005, Lewis's attorney filed three new pleadings in which he asserted that, because the psychiatric evaluations were ordered over defense objection, Lewis's Fifth and Sixth Amendment rights were violated when he participated in the psychiatric interviews, and thus (1) the results of the evaluations should be suppressed and (2) the

jury at Lewis's trial should be precluded from returning a "guilty but mentally ill" verdict.

While these motions were pending, a new trial judge—Superior Court Judge John Suddock—was assigned to Lewis's case. On January 20, 2006, Judge Suddock issued an omnibus order resolving all of Lewis's inter-related motions.

*Judge Suddock's decision*

Judge Suddock rejected Lewis's factual contention that Judge Card's order of April 25, 2005 (*i.e.*, the order directing further psychiatric evaluations of Lewis) was issued over defense objection.

Judge Suddock noted that Judge Card ordered the psychiatric evaluations because he believed that, realistically, Lewis's case could not be litigated without testimony concerning Lewis's mental health. Judge Suddock further noted that, even though the prosecutor declared that she was willing to go forward without expert testimony on this issue, Judge Card interpreted AS 12.47.070(a) as requiring him to order the psychiatric evaluations, given his conclusion that Lewis's mental health status would likely become an issue in the case. Judge Suddock then pointed out that, after Judge Card announced his ruling and the statutory basis for it, Lewis's attorney stated that she *concurred* in the ruling.

Judge Suddock (who apparently went back to listen to the audio recording of the April 25, 2005 proceeding) quoted the defense attorney's response to Judge Card's ruling:

> *Defense Attorney:* I agree that if the court is making a determination that mental illness essentially will become an issue in the case, then I think that that's a fair decision to make, ... [and] the [basis of the] court's decision is clear in the statute.

Thus, Judge Suddock rejected Lewis's contention that the psychiatric evaluations had been ordered over his attorney's objection.

Judge Suddock also rejected Lewis's contention that the State was the only party who wished to litigate issues surrounding Lewis's mental health, and that the defense had never put Lewis's mental health at issue.

Judge Suddock noted that, at the April 25th hearing, Lewis's defense attorney told Judge Card that she intended to argue at trial that Lewis's abnormal behavior could be attributed to the fact that he had recently taken the drug Neurontin, a psychotropic medication that had not been prescribed for him. Judge Suddock concluded that this announced defense effectively placed Lewis's mental status at issue. The judge reasoned that if Lewis claimed that his assaultive behavior was the result of ingesting Neurontin, this claim would, as a practical matter, force the jury to resolve issues pertaining to Lewis's underlying mental diseases or defects—thus triggering the provisions of AS 12.47.070(a).

For these reasons, Judge Suddock concluded that Judge Card acted properly when he ruled that AS 12.47.070(a) required him to order the psychiatric evaluations. And, for basically the same reasons, Judge Suddock concluded that it would be proper to instruct the trial jury on the possibility of returning a verdict of "guilty but mentally ill"—and the judge declared that he would do so.

Based on the rulings that we have just described, Judge Suddock further concluded that Lewis had no Fifth or Sixth Amendment claim with respect to the court-ordered psychiatric examinations. Judge Suddock ruled that there was no violation of either the Fifth or the Sixth Amendment because (1) Lewis's attorney did not object to these examinations, but rather concurred that the examinations were proper; and (2) Lewis's attorney, by raising a defense based on Lewis's ingestion of Neurontin, affirmatively placed Lewis's mental condition at issue—thus (as a matter of law) waiving any constitutional right to object to the psychiatric examinations.

Finally, having decided that Lewis had no valid objection to the psychiatric evaluations, Judge Suddock ruled that the time needed to perform these evaluations was properly excluded from the Rule 45 calculation—meaning that the time for bringing Lewis to trial had not yet expired.

*Lewis's trial*

Lewis's jury trial began on February 28, 2006, with Judge Suddock presiding. The first day was devoted to jury selection. The

following day (March 1st), both parties delivered their opening statements.

As we have explained, both Lewis's previous attorney and his current attorney had repeatedly declared that they did *not* intend to argue that, because of mental disease or defect, Lewis lacked the culpable mental states required for third-degree assault. But despite these earlier protestations, this was precisely the defense that Lewis's attorney outlined to the jury in his opening statement:

*Defense Attorney:* Ladies and gentlemen, this case is really about a man who's mentally ill. We can't avoid that topic. It's part of the whole substance of this case. Dekeitric Lewis has been diagnosed [as mentally ill] in the past, and his family is aware of that. [The] man [charged with these crimes] was mentally ill. [He] had been prescribed ... medication to control his thoughts and his actions that result from this mental illness.... [He] had been locked away in an institution and kept from his family for a ... substantial period of time.... But, several days before this incident, he was released from that [supervised] setting; he was released from that residential setting where he was monitored and supervised—and basically thrown back out on the street.

. . .

[Lewis went to stay with his father.] [And h]is father was concerned because Mr. Lewis, when he came to stay with him, was pacing, acting anxiety-[filled], not acting rational. And his father was concerned.... His father believed, apparently, that Mr. Lewis was not taking [his prescribed] medications.... These medications, obviously, are important to keeping him in a steady frame of mind—and from the [behavior] that his father saw, apparently Mr. Lewis was not taking his medication.

The defense attorney then described how Lewis's father concluded that it would be better if Lewis went to stay with his mother—but when Lewis got to his mother's house, he learned that his sister was pregnant by someone that Lewis did not think highly of. According to the defense attorney, this made Lewis angry:

*Defense Attorney:* [Lewis's] mental illness ... makes him very excitable on issues that concern his role as protector of the family. And he felt, apparently, that he had not protected the family, and his sister had gotten pregnant, and so he's angry at her.

The defense attorney described how Lewis had words with his sister, and then backed her into a bathroom and resisted his mother's attempts to intervene. The defense attorney told the jurors that Lewis's sister was "worried [about] what [was] going to happen—you know, how far [Lewis was] going to go—because [she and her mother] don't know exactly what [Lewis] is capable of when he's in this state, where his mental illness is not controlled by medication."

The defense attorney then described how Lewis picked up a sharp knife—a steak knife or a boning knife:

*Defense Attorney:* What he was intending to do with that knife is not really clear, because he's in such a mental state.... He may have said words to the effect of, "I'm going to cut you", but he may have also been intending to cut himself. One really doesn't know. Thank God no one was cut. He didn't, you know, actually lunge at anybody or try to cut anybody with this knife. He's just holding it [and] he's talking as if he's—I mean, for want of a better term, like an insane person.

. . .

He's very upset.... And where ... his mind [is] during this whole time is really the question that comes to the fore when you ... do your deliberations after you've heard all the evidence. You know—legally, what does this mean? What happened? Is this a family dispute? Is it a crime? Well, what it's going to come down to, I think, in your deliberations will be: What was his mental state during the times that he made these threatening ... words to people?

The defense attorney then expressly stated his main contention—that Lewis lacked the culpable mental state required for third-degree assault:

*Defense Attorney:* What's probably ... crucial [to your decision] is: Did Mr. Lewis act recklessly? Because the law defines "recklessly" in a way that requires a person to be aware of a certain type of risk, and to consciously disregard that risk and go ahead and do their conduct anyway.... [T]he law requires [proof] that [the] person [was] aware of the risk that they [would] place someone in fear by what they're doing, and consciously disregard it. Now, ... "consciously disregard" implies a certain mental coherence that the law requires before a person can be said to be "reckless". I think the evidence will show that [Lewis] did not have [the] mental coherence to know that he was consciously disregarding this risk.

...

The law requires [proof that he] actually, ... coherently [was] conscious of the risk, and ... consciously disregard[ed] it. That [proof is] very difficult on these facts. You have a man who is mentally ill and off his medication, apparently. It's very difficult to determine what was in his mind. And ladies and gentlemen, I don't think the proof will be there, ... beyond a reasonable doubt, that Mr. Lewis in his mind was aware of and consciously disregard[ed] ... the effect he was having on other people.

The prosecutor then presented the State's case. The State's first five witnesses were the 911 dispatcher and four people who were either victims of, or witnesses to, the assaults. The State's final witness was Dr. Sperbeck.

Although Dr. Sperbeck testified during the State's case-in-chief, he essentially performed the role of a rebuttal witness. In his testimony, Dr. Sperbeck responded to the defense argument that Lewis lacked the culpable mental state for third-degree assault, either because of Lewis's underlying mental condition or (alternatively) because Lewis had recently taken Neurontin.

Dr. Sperbeck told the jurors that Lewis had borderline intellectual functioning, and that he suffered from schizo-affective disorder, manic type, as well as antisocial personality disorder. Dr. Sperbeck informed the jurors that Lewis had been prescribed medications for these disorders, and that the medications did work for him—stabilizing his thinking and his emotions.

Dr. Sperbeck testified that Lewis's mental illnesses did not prevent him from acting "intentionally" or "recklessly", but Sperbeck did not offer an opinion as to whether Lewis actually *was* acting intentionally or recklessly during the events being litigated.

In response to a question from the prosecutor, Dr. Sperbeck agreed that the jurors would have to answer that question for themselves: they would have to "look to the things said or done at or near the time of the events" and then "evaluate [for themselves] whether Mr. Lewis had the ability to intend the consequences of his conduct."

Dr. Sperbeck did, however, address the contention that Lewis's ingestion of Neurontin might have caused him to think and act erratically. Dr. Sperbeck told the jury that, although Neurontin was not one of Lewis's regularly prescribed medications, Neurontin is in fact used for the treatment of schizo-affective disorder (one of Lewis's mental conditions). This drug helps to reduce a patient's manic symptoms and the intensity of a patient's mood swings.

Thus, Dr. Sperbeck testified, if Lewis did in fact take Neurontin, it probably did not worsen his condition. Dr. Sperbeck explained that Neurontin is "actually used in psychiatric facilities to treat the disorder [that Lewis] has, so it's unlikely that it would have had any negative effects on him. [It's] more likely that it would have had positive [effects]. [And] if he only had one dose, it's most likely that it would have had no effect"—because "[m]ost psychotropic medications require a certain period of time for them to build up in the blood system and have a therapeutic effect ... or any effect."

In sum, during direct examination by the prosecutor, Dr. Sperbeck offered no opinion as to whether Lewis acted with the culpable mental states required for third-degree assault. Dr. Sperbeck confined himself to the two assertions (1) that Lewis's mental diseases and defects would not have prevented him from having those culpable mental

states, and (2) that Lewis's ingestion of Neurontin was unlikely to have adversely affected his behavior or thinking.

The cross-examination by the defense attorney was a different story. During cross-examination, Lewis's attorney repeatedly tried to get Dr. Sperbeck to offer opinions on what Lewis's mental state actually was on the day of this incident. By his questions, the defense attorney suggested that Lewis lost touch with reality on the day of the assaults because he had not been taking his normal medications.

Following Dr. Sperbeck's testimony, the State rested. Lewis did not present a case. The jury found Lewis guilty but mentally ill on all four counts.

*Lewis's argument that Judge Card should not have ordered the psychiatric evaluations, and that these evaluations were conducted in violation of Lewis's rights under the Fifth Amendment*

As explained above, the parties assembled in court on April 25, 2005 for what was to have been the start of Lewis's trial. But after the prosecutor announced that she wanted to submit a "guilty but mentally ill" verdict to the jury because the testimony of Lewis's mother and sister would inevitably touch on his mental health problems, and after the defense attorney announced that Lewis intended to argue that he lacked the culpable mental states required for third-degree assault because of his ingestion of Neurontin, Judge Card concluded—in the words of AS 12.47.070(a)—that "there [was] reason to believe that a mental disease or defect of the defendant [would] ... become an issue in the case". Based on this finding, Judge Card delayed Lewis's trial and ordered that Lewis be examined and evaluated by two psychiatrists or forensic psychologists.

On appeal, Lewis concedes that AS 12.47.070(a) appears to authorize Judge Card's action. In fact, as Judge Card noted when he issued his order, the statute appears to *require* this action whenever a judge determines that there is reason to believe that

a defendant's mental disease or defect will become an issue in the case.

(Under AS 12.47.070(a), when a court determines that there is reason to believe that a defendant's mental disease or defect will become an issue in the case, "the court *shall* appoint at least two qualified psychiatrists or two forensic psychologists ... to examine and report upon the mental condition of the defendant." (Emphasis added))

■ Nevertheless, Lewis claims on appeal that these psychiatric examinations were conducted in violation of his Fifth Amendment privilege against self-incrimination.

■ Before addressing this Fifth Amendment claim, we note that Lewis's brief to this Court also contains passing references to the Sixth Amendment right to counsel. However, Lewis presents no separate argument or analysis under the Sixth Amendment. Moreover, the record in Lewis's case provides no reason to believe that his Sixth Amendment right to counsel was violated.

■ A criminal defendant has the right to the assistance of counsel when deciding whether to participate in a psychiatric examination if that examination takes place in connection with a criminal prosecution after the defendant's right to counsel has attached.[1] But as we explained above, and as Judge Suddock noted in his decision dated January 20, 2006, Lewis's attorney did not object when Judge Card ordered the psychiatric evaluations in this case. Indeed, viewing the record in the light most favorable to Judge Suddock's decision, Lewis's attorney expressly concurred in Judge Card's action. In particular, with regard to Judge Card's conclusion that mental disease or defect would apparently be an issue in the case, the defense attorney told the judge, "I think that that's a fair decision to make." And with regard to Judge Card's decision to order the psychiatric evaluations, the defense attorney told the judge that "the [basis of the] court's decision is clear in the statute."

These facts seemingly dispose of any claim that the psychiatric examinations were conducted in violation of Lewis's Sixth Amend-

---

**1.** *Estelle v. Smith*, 451 U.S. 454, 469–471, 101    S.Ct. 1866, 1876–77, 68 L.Ed.2d 359 (1981).

ment right to counsel. Lewis's counsel knew that the examinations had been ordered, and she did not object. Nor is there anything in the record to indicate that the defense attorney was denied the opportunity to counsel Lewis about the potential benefits and dangers of participating in these examinations.

■ Given this record, and given the lack of meaningful briefing regarding the Sixth Amendment, we conclude that if, indeed, Lewis intended to present a Sixth Amendment claim, that claim is waived.

We therefore turn to Lewis's Fifth Amendment claim. The resolution of this claim hinges on the answer to the question: Did Lewis affirmatively put his mental condition at issue?

In *Estelle v. Smith*, 451 U.S. 454, 101 S.Ct. 1866, 68 L.Ed.2d 359 (1981), the United States Supreme Court held that a criminal defendant has a Fifth Amendment right to decline to participate in a psychiatric examination to the extent that (1) the results of the examination are to be introduced by the State either to prove the defendant's guilt or to enhance the defendant's sentence, and (2) the psychiatric evaluation will be based on the defendant's statements elicited during the examination. 451 U.S. at 461–66, 101 S.Ct. at 1872–75.

Relying on *Estelle* and on this Court's ensuing decision in *R.H. v. State*, 777 P.2d 204 (Alaska App.1989), Lewis argues that Judge Card violated his Fifth Amendment right against self-incrimination when the judge ordered the psychiatric evaluations on April 25, 2005.

■ But as this Court explained in *R.H.*, a defendant waives their right to claim a Fifth Amendment privilege with respect to statements made during psychiatric examinations if the defendant intends to rely on psychiatric testimony of their own, or if the defendant has "otherwise affirmatively placed [their] mental condition in issue." 777 P.2d at 211. See also *Estelle*, 451 U.S. at 465–66, 101 S.Ct. at 1874, citing with approval several court decisions holding that when a defendant asserts an insanity defense, the defendant can be required to participate in psychi-

atric examinations conducted on behalf of the government.

Lewis concedes that he would have no Fifth Amendment claim if he had asserted the affirmative defense of insanity defined in AS 12.47.010 (inability to appreciate the nature and quality of one's conduct because of mental disease or defect). Lewis likewise concedes that he would have had no Fifth Amendment claim if he had asserted the alternative defense of diminished capacity defined in AS 12.47.020(b) (reasonable doubt, based on mental disease or defect, as to whether the defendant possessed one or more of the culpable mental states required for the crime). But Lewis argues that his case is different because he did not plead either of these defenses, nor did he offer expert testimony regarding his mental diseases or defects.

There are two answers to Lewis's argument—two reasons why we conclude that Lewis waived his Fifth Amendment privilege to object to the psychiatric evaluations ordered by Judge Card.

*Lewis put his mental health at issue when he asserted that his behavior was attributable to his ingestion of Neurontin*

Even though Lewis did not plead insanity as defined in AS 12.47.010 or diminished capacity as defined in AS 12.47.020, Lewis did in fact place his mental condition at issue. He did so when, through his attorney, he told Judge Card that he intended to argue that his erratic thinking and behavior on the day of the assaults was attributable to his recent ingestion of Neurontin.

As explained in Lewis's opening brief to this Court, Lewis informed Judge Card that he was planning to argue "that his behavior [on the day in question] was the result of his father giving him the drug Neurontin, a drug that ... was not prescribed [for him]", and that he also intended to "have his family [members] testify that [his] behavior on the day in question was different from his normal behavior".

As Judge Suddock correctly perceived, this Neurontin defense implicitly rested on the assertion that Lewis's mental state on the day in question was significantly different

from his typical mental state—*i.e.*, the mental state he would otherwise have had, if he had not ingested Neurontin.

For people who do not suffer from mental illness, the question of whether their mental state was significantly affected by the ingestion of a medication can be answered by comparing their mental state on the occasion in question to the "normal" mental state enjoyed by most people. But for people like Lewis who suffer from mental illness, the question of whether their mental state was significantly affected by the ingestion of a medication can not be gauged by comparing their thinking and behavior to the "normal" thinking and behavior of most people. Rather, the effect of the medication can only be gauged by first ascertaining the defendant's *typical* thinking and behavior—*i.e.*, the thinking and behavior that the defendant would normally exhibit, as shaped by the defendant's mental diseases or defects—and then comparing that to the thinking and behavior that the defendant exhibited on the day in question.

In other words, in order for the jury to meaningfully evaluate Lewis's claim that his erratic thinking and behavior was attributable to his ingestion of Neurontin, the jury would have to be informed of Lewis's underlying mental diseases or defects. The jury would also need to understand how these chronic diseases or defects would shape Lewis's everyday thinking and behavior, and how the ingestion of Neurontin might affect someone with Lewis's mental conditions.

Thus, when Lewis declared that he intended to present a defense based on his ingestion of Neurontin, he was placing his mental diseases and defects at issue. He therefore waived any Fifth Amendment objection to the State's evaluation of those mental diseases and defects, and to the State's presentation of evidence concerning the results of that evaluation.

*At trial, Lewis abandoned his Neurontin defense and instead argued explicitly that, because of his underlying mental diseases or defects, he lacked the culpable mental states required for third-degree assault*

Our second, independent reason for rejecting Lewis's Fifth Amendment claim is that,

contrary to all of Lewis's attorneys' pre-trial protestations, Lewis's defense at trial *was* that, because of mental disease or defect, Lewis lacked the culpable mental states required for third-degree assault. Lewis's trial attorney may not have given notice of this defense as required by AS 12.47.020(a), but he did pursue this defense.

Lewis's attorney delivered his opening statement to the jury at the beginning of trial, rather than waiting for the conclusion of the State's case-in-chief. As we explained earlier in this opinion, that opening statement began with the assertion that Lewis's case was "about a man who's mentally ill"—a man who had been prescribed medications "to keep[ ] him in a steady frame of mind", and who had "apparently [stopped] taking his medications".

The defense attorney told the jurors that "[Lewis's] mental illness . . . [made] him very excitable on issues that concern his role as protector of the family. And he felt, apparently, that he had not protected the family, and his sister ha[d] gotten pregnant, and so [he became] angry at her." The defense attorney next described how Lewis's mother and sister became fearful because they did not know "how far [Lewis was] going to go [or] exactly what [Lewis is] capable of when . . . his mental illness is not controlled by medication."

The defense attorney told the jurors that Lewis picked up a sharp knife and began "talking . . . like an insane person." The defense attorney then expressly argued that, because of mental illness, Lewis lacked the culpable mental state required for third-degree assault:

> *Defense Attorney:* [The element of] "consciously disregard" implies a certain mental coherence that the law requires before a person can be said to be "reckless". I think the evidence will show that [Lewis] did not have [the] mental coherence to know that he was consciously disregarding this risk.
>
> . . .
>
> The law requires [proof that he] actually, . . . coherently [was] conscious of the risk, and . . . consciously disregard[ed] it.

That [proof] is very difficult on these facts. You have a man who is mentally ill and off his medication, apparently. It's very difficult to determine what was in his mind. And ladies and gentlemen, I don't think the proof will be there, ... beyond a reasonable doubt, that Mr. Lewis in his mind was aware of and consciously disregard[ed] ... the effect he was having on [other] people.

During the defense attorney's cross-examination of Lewis's mother, the attorney elicited testimony that Lewis was diagnosed as a schizophrenic in the 1990s, and that Lewis had told his mother that he hears voices. However, Lewis apparently does not believe that he is mentally ill; rather, he asserts that it is other people who are mentally ill.

Lewis's mother explained that Lewis has been prescribed medication to control his schizophrenia, but that he does not like to take the medication. In addition, Lewis's mother testified that she knew that Lewis was not taking his medication at the time of the incident in this case—because he didn't have any medications to take.

(On this last point, Lewis's mother was mistaken. The prosecutor and the defense attorney later stipulated—and informed the jury—that when Lewis was released from custody on November 12, 2004 (four days before the incident in this case), he received a week's supply of his medications.)

According to Lewis's mother, Lewis was restless—pacing and talking—and this is why Lewis's father gave him the Neurontin. Lewis's mother described Lewis as "just not himself".

During the defense attorney's cross-examination of Lewis's sister, he elicited similar testimony. Lewis's sister testified that Lewis began to manifest signs of mental illness at the age of 18 or 19. She described an incident where Lewis ran down the street without shoes or socks and started knocking on the door of a house that the family used to live in, asking his mother to open the door and then talking to his mother as if she was there.

Lewis's sister confirmed her mother's testimony that Lewis does not believe that he is mentally ill, and he does not like to take his medications. Lewis's sister explained that sometimes Lewis's illness was better, and sometimes it was worse, but that she had never seen him as ill as he was on the day of the assaults in this case. She had observed other times when he would pace back and forth, all night long without sleeping, and times when he heard voices.

Lewis's sister agreed with the defense attorney that Lewis's behavior on the day in question was at least partly attributable to his mental illness. And she confirmed her mother's testimony that Lewis was not taking his medications.

As we have already explained, Dr. Sperbeck was the State's final witness, and he offered testimony that was essentially rebuttal in nature. Dr. Sperbeck described Lewis's psychological diagnoses: borderline intellectual functioning; schizo-affective disorder, manic type; and antisocial personality disorder. Dr. Sperbeck testified that these mental illnesses did not prevent Lewis from acting "intentionally" or "recklessly", but Sperbeck stated that he could not offer a reliable opinion as to whether Lewis actually *was* acting intentionally or recklessly during the events being litigated. Dr. Sperbeck indicated that the jurors would have to "look to the things said or done at or near the time of the events", so that they could "evaluate [for themselves] whether Mr. Lewis had the ability to intend the consequences of his conduct".

Dr. Sperbeck did, however, testify that Lewis's ingestion of Neurontin was unlikely to have caused his erratic thinking and behavior—because Neurontin is used for the treatment of schizo-affective disorder (one of Lewis's mental conditions), and if the drug had any effect on Lewis, it would have been to reduce the manic symptoms and mood swings that characterize his schizo-affective disorder.

During his cross-examination of Dr. Sperbeck, Lewis's attorney elicited testimony that Lewis's mental state would have rapidly deteriorated if he stopped taking his medications. According to Dr. Sperbeck, Lewis's behavior would change noticeably if he

missed even a single dose. Dr. Sperbeck declared that if (as the testimony suggested) Lewis stopped taking his medications when he was released from custody four days before this incident, by the time of the incident Lewis would have begun suffering from paranoia—and he could possibly have started hearing voices or otherwise becoming delusional.

The defense attorney elicited the fact that Lewis had refused to cooperate during Dr. Sperbeck's psychiatric examination of him—and that, for this reason, Sperbeck was unable to offer an opinion as to whether Lewis's behavior on the day of the assaults was intentional or reckless. The defense attorney then elicited the fact that Lewis had begun manifesting serious emotional disturbance when he was in junior high school, and that Lewis had an extensive history of commitments to the Alaska Psychiatric Institute—eighteen in all, both voluntary and involuntary.

When the defense attorney asked Dr. Sperbeck if Lewis was "resistant to taking his medication", Dr. Sperbeck responded, " 'Resistant' isn't really a strong enough term." Sperbeck explained that he was unaware of any instance where Lewis voluntarily took his medications when he was outside of an institutional setting: "He has distinguished himself as extraordinarily non-compliant."

The defense attorney also elicited the fact that when Dr. Sperbeck performed the first post-arrest psychiatric evaluation of Lewis in this case, Sperbeck found Lewis to be incompetent to proceed—even though, by that time, Lewis had been involuntarily medicated for six days.

Toward the end of this cross-examination, the defense attorney elicited the following testimony from Dr. Sperbeck:

We're talking about a young man who [earlier, before diagnosis and treatment,] was uniquely under-achieving in every aspect of his life—dangerous, on the verge of all kinds of tragedy towards himself and other people. And [he] was finally properly evaluated and treated. I mean, this is a young man who, for six weeks, sat in a jail cell—before I found out about him—with Kleenex in his ears because he was hearing voices. [But] we got him properly diagnosed and treated, and ... on the road to recovery. And ... he has done much better. He's ... almost completely normal [when he is] on his medications.

Later, when Lewis's attorney delivered his summation to the jury, he never mentioned the evidence that Lewis's father had given him Neurontin. Instead, the defense attorney focused exclusively on the argument that, because of Lewis's underlying mental illness, Lewis did not have the culpable mental states required for third-degree assault.

The defense attorney told the jurors that Lewis's mental illness was the key to the case:

*Defense Attorney:* We [ordinarily] make assumptions, [based on] the way people treat us [and] the way they act, [about] what they may be thinking. But all that is thrown aside when you have someone who is mentally ill. How do you know what [people] are really thinking when they are mentally ill? It's hard enough with people [whom] we love and we're close to who [are] not mentally ill.

. . .

We're talking [about] someone who is ... off his med[ication]s—someone who has been prescribed these psychotropic meds and is now, according to Dr. Sperbeck, three to four days later, going to be de-compensating very seriously. And that means their perceptions of reality are changed—their ability to differentiate truth from fiction, their ability to tell whether they're listening to voices in their head, or they're listening to their own thoughts, or [whether] someone [else] is actually talking to them.

All those common assumptions that we make about people, that we use to try and decide [if they] were ... reckless—you just can't do that with someone that's mentally ill, especially when they're not under their medication. So I think [that] the State just can't prove that Mr. Lewis was reckless or intentional in the way he acted toward his mother, his sister, and the officers.

Toward the end of his summation, the defense attorney urged the jurors to consider the testimony of Lewis's mother and sister:

> *Defense Attorney:* Who knows [Lewis] better than his sister and his mom? Probably no one.... And what [did] they say, spontaneously, [when] the officers came in? "He's not himself. That's not him." His mother said, "I looked in his face, and he was like someone possessed. That's not my son." ...
>
> That's the strongest evidence I think you have that, yes, [Lewis] is mentally ill, [and] it was so affecting his conduct that he couldn't form those mental states that [are] required by the law.

In sum: It is true that Lewis's attorneys repeatedly declared in pre-trial hearings that they did not intend to argue that, because of mental illness, Lewis lacked the culpable mental states required for third-degree assault. But at trial, the defense changed course and made precisely this argument.

For this reason as well, we conclude that Lewis affirmatively placed his mental diseases or defects at issue—and, thus, Lewis waived any Fifth Amendment objection to Dr. Sperbeck's testimony.

*Lewis's argument that the jury should not have been given the option of returning a verdict of "guilty but mentally ill"*

On appeal, Lewis renews his argument that it was improper for Judge Suddock to give the jury the option of returning a verdict of "guilty but mentally ill".

*A brief description of the "guilty but mentally ill" verdict*

The verdict of "guilty but mentally ill" is defined in AS 12.47.030(a) and AS 12.47.040(b). This verdict constitutes a finding that the government has proved (beyond a reasonable doubt) all the elements of the offense charged against the defendant, including all required culpable mental states; and an additional finding (by a preponderance of the evidence) that, because of mental disease or defect, the defendant "lacked ... the substantial capacity either to appreciate the wrongfulness of [their] conduct or to conform [their] conduct to the requirements of law." AS 12.47.030(a).

The consequences of this verdict are spelled out in AS 12.47.050. Subsection (a) of this statute declares that a defendant who is found guilty but mentally ill shall receive a normal sentence for their crime but, under subsection (b), the Department of Corrections is required to provide mental health treatment to the defendant so long as the defendant continues to suffer from a mental disease or defect that causes the defendant to be dangerous. Subsection (d) of the statute declares that, during the portion of the sentence in which the defendant is receiving mental health treatment under subsection (b), the defendant is not eligible for parole and can not be released on furlough except to a secure setting.

Finally, under subsection (e) of the statute, if the defendant is still receiving mental health treatment under subsection (b) as the defendant nears the end of their sentence, and if the Commissioner of Corrections has good cause to believe that the defendant still suffers from a mental illness that causes them to be dangerous, the Commissioner is obligated to file a petition for the defendant's involuntary commitment under AS 47.30.700.

*Lewis's argument*

Under Alaska law, there are two ways in which a defendant may be found guilty but mentally ill. In some instances, AS 12.47.040 declares that the trial jury must make this decision. But if this issue is not presented to the jury, and if the defendant is convicted at trial, AS 12.47.060 declares that "the defendant, the prosecuting attorney, or the court on its own motion may raise the issue of whether the defendant is guilty but mentally ill."

If this issue is raised after trial, AS 12.47.060 directs the court to determine whether the defendant is guilty but mentally ill based on any pertinent evidence presented at trial and on any additional evidence presented at the post-conviction hearing.

In this appeal, Lewis argues that the question of whether he was guilty but mentally ill was presented to the wrong fact-finder. Lewis conceded to the superior court, and he concedes again on appeal, that if he had been found guilty at his trial, the superior court

would have been authorized by AS 12.47.060 to investigate and decide whether he was guilty but mentally ill. But Lewis argues that it was legally improper to present this issue to his trial jury.

Lewis's claim hinges on a question of statutory interpretation. The statute in question is AS 12.47.040(a):

> *Form of verdict when evidence of mental disease or defect is admissible.*
>
> (a) In a prosecution for a crime when the affirmative defense of insanity is raised under AS 12.47.010, or when evidence of a mental disease or defect of the defendant is otherwise admissible at trial under AS 12.47.020, the trier of fact shall find, and the verdict shall state, whether the defendant is
>
> (1) guilty;
>
> (2) not guilty;
>
> (3) not guilty by reason of insanity; or
>
> (4) guilty but mentally ill.

Lewis notes that, even though the title of this statute seemingly refers to *all* cases where evidence of a defendant's mental disease or defect is admissible, the text of the statute does not state so broad a rule. According to the text of the statute, a trial judge's obligation to instruct the jury on the verdict of "guilty but mentally ill" arises only when (1) the defendant raises the defense of insanity under AS 12.47.010 or when (2) "evidence of a mental disease or defect of the defendant is otherwise admissible at trial under AS 12.47.020".

■ (To the extent that the title of the statute might suggest a different, broader rule that is inconsistent with the text of the statute, we would be obliged to ignore the title. Section headings and the captions of statutes are not part of the law.[2])

Lewis contends that his jury should not have been instructed on the potential verdict of "guilty but mentally ill" because he neither raised the defense of insanity as defined in AS 12.47.010 nor raised the defense of diminished capacity as defined in AS 12.47.020— *i.e.*, the defense that, because of mental dis-

ease or defect, he lacked one or more culpable mental states required to prove the crime.

■ But as Judge Suddock correctly noted when he denied Lewis's pre-trial motion to preclude a "guilty but mentally ill" verdict in this case, Lewis's argument is based on a misreading of AS 12.47.040(a).

■ First, although the statute defines a group of cases where the jury *must* receive a "guilty but mentally ill" verdict, the statute does not expressly preclude trial judges from giving this verdict to the jury in other cases. Potentially, this option remains open to trial judges in all cases where evidence of a defendant's mental disease or defect is admitted for any purpose.

Second, contrary to Lewis's argument, the statutory mandate to instruct the jury on a verdict of "guilty but mentally ill" is not limited to cases where the defendant affirmatively raises a defense of diminished capacity based on mental disease or defect under AS 12.47.020. Rather, the statute says that the jury shall be instructed on the verdict of "guilty but mentally ill" in all cases where "evidence of a mental disease or defect ... is otherwise admissible at trial under AS 12.47.020".

The statute referred to, AS 12.47.020, does not limit the admissibility of evidence of mental disease or defect to cases where the defendant raises a defense of diminished capacity. Rather, subsection (a) of this statute declares that "[e]vidence that the defendant suffered from a mental disease or defect is admissible *whenever it is relevant* to prove that the defendant *did or did not have* a culpable mental state which is an element of the crime." (Emphasis added)

■ Lewis relies on the next sentence of AS 12.47.020(a): "[E]vidence of mental disease or defect that tends to negate a culpable mental state is not admissible unless the defendant ... files a written notice of intent to rely on that defense." But as Judge Suddock correctly pointed out, this clause of the statute only limits the introduction of evi-

---

**2.** *See* AS 01.05.006; *DeNuptiis v. Unocal Corp.,* 63 P.3d 272, 278 n. 15 (Alaska 2003); *Ketchikan* *Retail Liquor Dealers Ass'n v. Alcoholic Beverage Control Board,* 602 P.2d 434, 438 (Alaska 1979).

dence of mental disease or defect that tends to *negate* a culpable mental state. It does not speak to evidence of a mental disease or defect that tends to *prove* a culpable mental state.

As we have explained, evidence of Lewis's mental diseases or defects was relevant to rebut his claim that his erratic behavior was due entirely to his ingestion of Neurontin. Offered for this purpose, the evidence tended to prove, not defeat, the State's allegations of third-degree assault. Accordingly, the evidence was admissible under the first sentence of AS 12.47.020(a). And because this evidence was "admissible at trial under AS 12.47.020", Lewis's trial judge was obliged under AS 12.47.040(a) to instruct the jury on the verdict of "guilty but mentally ill".

This resolves Lewis's claim of error. We note, however, that Lewis's claim fails for an additional reason: Despite his repeated protests that he did not intend to raise a defense of diminished capacity based on mental disease or defect, Lewis did in fact pursue this defense at trial. We described Lewis's litigation strategy—his opening statement, his examination of the witnesses, and his summation to the jury—earlier in this opinion. Because Lewis pursued this defense, the trial judge correctly instructed the jury on the verdict of "guilty but mentally ill".

It is true that Lewis failed to give notice of this defense. Potentially, Lewis's failure to comply with the notice requirement codified in the second sentence of AS 12.47.020(a) might have given the State a valid ground to object to Lewis's pursuit of this defense. (We do not decide that issue.) But Lewis can not use his failure to comply with the notice requirement as a sword to advance his own interests. In other words, Lewis was not entitled to (1) pursue a defense of diminished capacity based on mental disease or defect and then, when the State asked the trial judge to instruct the jury on "guilty but mentally ill", (2) object that this verdict was improper because he had failed to give proper notice of this defense.

In Lewis's reply brief to this Court, he suggests that he was forced to relinquish the defense that he announced before trial (the Neurontin-intoxication defense) and, instead, to pursue a defense of diminished capacity based on mental disease or defect. Lewis declares that he was forced to adopt this new litigation strategy after Judge Suddock ruled that the jury would be given a "guilty but mentally ill" verdict, and that the State would be allowed to call Dr. Sperbeck to testify about his evaluation of Lewis.

During the proceedings in the superior court, Lewis's attorney said nothing on this subject; he offered no explanation for his change in litigation strategy. And there is nothing in the record to support Lewis's assertion that Judge Suddock's ruling forced him to change his strategy. In particular, Judge Suddock's rulings did nothing to derail the Neurontin-intoxication defense that Lewis announced before trial.

It is true that Dr. Sperbeck's report, and his later testimony, seriously undercut Lewis's proposed Neurontin-intoxication defense. As explained above, Dr. Sperbeck (both in his report and in his trial testimony) declared that it was unlikely that Neurontin would have disoriented Lewis or disrupted his thinking-because Neurontin is, in fact, prescribed for schizo—affective disorder; it reduces a patient's manic symptoms and mood swings.

But the admissibility of Dr. Sperbeck's testimony on this issue did not hinge on Judge Suddock's rulings. True, Judge Suddock ruled that Lewis had no valid Fifth Amendment objection to Dr. Sperbeck's examination of Lewis, or to Sperbeck's later testimony about the results of that examination. But Dr. Sperbeck's testimony about Lewis's mental illnesses and the effects of Neurontin would have been admissible even if Judge Suddock had ruled in Lewis's favor on these issues.

As explained above, there were two primary aspects to Dr. Sperbeck's testimony in this case: his description of Lewis's underlying mental illness, and his testimony concerning the effects of Neurontin on someone with that mental condition. Dr. Sperbeck's diagnosis of Lewis as suffering from schizo-affective disorder and antisocial personality disorder was not based on the most recent psychiatric examination that Lewis chal-

lenges in this appeal. Rather, it was based on Dr. Sperbeck's prior diagnoses and treatment of Lewis during his many prior commitments (both voluntary and involuntary) to the Alaska Psychiatric Institute. And Dr. Sperbeck's testimony concerning the psychotropic effects of Neurontin was based on his general expertise as a forensic psychologist and on his knowledge of the therapeutic uses of Neurontin—not on anything that Lewis said to him during their interview.

In other words, Dr. Sperbeck would still have been able to offer this testimony on these two subjects even if Judge Suddock had sustained Lewis's Fifth Amendment objection to having Dr. Sperbeck testify about his most recent examination of Lewis.

For these reasons, the record does not dispel the presumption that Lewis's attorney freely chose his litigation strategy. Rather, the record suggests that the defense attorney, having seen Dr. Sperbeck's report—in particular, the portion of the report where Dr. Sperbeck described the psychotropic effects of Neurontin and the unlikelihood that Lewis's erratic behavior could be attributed to his ingestion of that drug—voluntarily decided to abandon the Neurontin-intoxication defense and to advance a diminished capacity defense instead.

And because Lewis presented a defense of diminished capacity based on mental disease or defect, Judge Suddock was obliged under AS 12.47.040(a) to instruct the jury on the potential verdict of "guilty but mentally ill".

*Lewis's argument that the delay attributable to the psychiatric evaluations ordered by Judge Card should have been counted against the State for purposes of Criminal Rule 45*

Lewis contends that the delay attributable to the psychiatric evaluations (April 25 through August 24, 2005) should have been counted against the State for purposes of Criminal Rule 45. But Lewis's argument is premised on the assertion that Judge Card acted illegally by ordering these evaluations over the defense attorney's objection, and in violation of Lewis's rights under the Fifth Amendment.

As we have explained, (1) Lewis's attorney did not object to the evaluations and (2) the evaluations did not violate Lewis's rights under the Fifth Amendment. Accordingly, we reject Lewis's Rule 45 claim.

*Conclusion*

The judgement of the superior court is AFFIRMED.