Kim Michael COOK, Petitioner,

v.

STATE of Alaska, Respondent.

No. S–14549.

Supreme Court of Alaska.

Nov. 18, 2013.

Rehearing Denied Nov. 21, 2013.

Before: FABE, Chief Justice, WINFREE, STOWERS, MAASSEN, Justices, and EASTAUGH, Senior Justice.*

**Order**

1. The facts of this case were summarized by the court of appeals in its decision below.[1] We recount only the most salient facts: Kim Cook killed a police officer and was charged with first-degree murder. He was also sued in a civil action brought by the police officer's

---

* Sitting by assignment made under article IV, section 11 of the Alaska Constitution and Alaska Administrative Rule 23(a).

1. *State v. Cook,* 265 P.3d 342, 343–45 (Alaska App.2011).

estate. After Cook failed to answer the civil complaint, Superior Court Judge Beverly Cutler entered a default judgment against Cook, and the police officer's estate began to freeze Cook's assets in an attempt to collect the judgment.

2. When Cook eventually responded to the civil lawsuit, he filed a motion asking the superior court to set aside the default judgment. Judge Cutler denied Cook's motion; as a result, Cook was unable to use his assets to hire private defense counsel to represent him in the criminal case. Cook appealed that decision. While that appeal was pending, the criminal case proceeded against him. A public defender was appointed to represent Cook in the criminal case. The criminal case was reassigned to Superior Court Judge Fred Torrisi, who reviewed Cook's allegation that the State had committed prosecutorial misconduct by sharing Cook's confidential financial information with the plaintiff in the civil case, which allowed the plaintiff to locate and seize Cook's assets so that he could not hire a private attorney. Cook argued in a motion to continue that the State's conduct amounted to a deprivation of his Sixth Amendment right to choice of counsel. Judge Torrisi denied the motion. Cook was subsequently convicted of first-degree murder. Cook's criminal conviction was upheld on appeal.[2] In that appeal, Cook did not argue that his Sixth Amendment rights had been violated.[3]

█ 3. Almost two years after Cook was convicted of murder, we held that the superior court erred in the civil case by failing to recognize the difficulties Cook faced in responding timely to the civil complaint and refusing to set aside the default judgment.[4] The error we identified did not include any failure by the superior court to take Cook's Sixth Amendment rights into account when it denied his motion to set aside the default judgment.[5] Cook then filed a petition for post-conviction relief from his murder conviction, arguing that Judge Cutler's error in the civil case amounted to a deprivation of his Sixth Amendment right to choice of counsel. Superior Court Judge Eric Smith granted the petition for post-conviction relief and set aside Cook's murder conviction. The court of appeals reversed.[6] Cook petitioned for hearing, and we granted the petition. We are now faced with the narrow question whether the decision in the civil appeal reversing the denial of the motion to set aside the default judgment is a new fact under AS 12.72.010(4) that "requires vacation of the [criminal] conviction or sentence in the interest of justice."[7]

█ 4. A criminal defendant has a right under the Sixth Amendment to the United States Constitution and article I, section 11 of the Alaska Constitution to counsel of his choice.[8] This right is not absolute. The defendant has no right to insist on representation by an attorney that he cannot afford.[9] Nor does he have a right to spend assets that have been lawfully seized or frozen in a separate proceeding, even if those assets are necessary to retain the attorney of his choice.[10] The United States Supreme Court has stated that "the essential aim" of the Sixth Amendment "is to guarantee an effective advocate for each criminal defendant rather than to ensure that a defendant will inexorably be represented by the lawyer whom he prefers."[11]

5. In *Cook v. Rowland*, we concluded that Judge Cutler erred in failing to recognize Cook's difficulty in responding timely to the

---

**2.** *Cook v. State*, Mem. Op. & J. No. 4847, 2004 WL 719771, at * 1 (Alaska App., Mar. 31, 2004).

**3.** *See generally id.*

**4.** *Cook v. Rowland*, 49 P.3d 262, 264 (Alaska 2002).

**5.** *Id.* at 264–67.

**6.** *State v. Cook*, 265 P.3d 342 (Alaska App.2011).

**7.** AS 12.72.010(4).

**8.** *McKinnon v. State*, 526 P.2d 18, 21 (Alaska 1974).

**9.** *Wheat v. United States*, 486 U.S. 153, 159, 108 S.Ct. 1692, 100 L.Ed.2d 140 (1988).

**10.** *See Caplin & Drysdale, Chartered v. United States*, 491 U.S. 617, 626, 109 S.Ct. 2646, 105 L.Ed.2d 528 (1989).

**11.** *Wheat*, 486 U.S. at 159, 108 S.Ct. 1692 (citations omitted).

civil suit to be excusable neglect when she refused to set aside the default judgment against Cook in the civil case.[12] This error may have had the collateral consequence of depriving Cook of the funds necessary to hire the private counsel of his choice. But there is no evidence that either the State prosecutor or Judge Cutler had any intent to interfere with Cook's ability to hire private counsel or to deprive him of his Sixth Amendment rights. Indeed, Judge Smith quoted Judge Torrisi's earlier finding that the State had not intentionally tried to restrict Cook's choice of counsel: "[I]t is absolutely clear that the State was not trying to prevent Mr. Cook from hiring private counsel. In fact, they were doing the exact opposite." As Judge Torrisi noted, the State was actually "trying to make sure [Cook] hired [private counsel] if he had that much money."[13] Cook does not challenge this factual finding. Nor is there any evidence that Judge Cutler acted with intent to violate Cook's Sixth Amendment rights. Judge Smith made no such finding, and the court of appeals concluded that restriction of Cook's choice of counsel "was not the point" of Judge Cutler's refusal to set aside the default judgment and observed that there was no evidence in the record that she considered Cook's ability to hire the counsel of his choice when she made her decision.[14] Cook does not dispute this conclusion. Indeed, Cook argues that intent is immaterial and that he should be granted a new trial on Sixth Amendment grounds "regardless of [Judge Cutler's] motives." It is unsurprising that Judge Cutler would not have considered any Sixth Amendment impli-

cations of her default judgment ruling given that Cook did little or nothing to flag the issue in the civil case. Although Cook asserted that the entry of default made it impossible for him to hire an attorney in the *civil* case, he never asserted in the civil case that he could not afford an attorney in the criminal case. And Cook never argued to Judge Cutler that her refusal to set aside the default judgment violated his Sixth Amendment rights in the criminal case.[15] Nor did he appeal Judge Cutler's denial of his motion to set aside the default judgment on Sixth Amendment grounds. The question, then, is whether an incidental error in a separate civil case, detected years later on appeal and unintentionally affecting a criminal defendant's ability to hire the counsel of his choice, is enough to overturn an otherwise valid conviction in the criminal case and order a new trial on Sixth Amendment grounds.

■ 6. The United States Supreme Court has generally rejected the idea that civil actions that collaterally affect a defendant's financial condition—and thus his ability to afford the attorney of his choice in a separate criminal case—violate the Sixth Amendment right to choice of counsel. In *Caplin & Drysdale, Chartered v. United States*, the Court held that the Sixth Amendment right to counsel does not prevent a criminal defendant's assets from being seized in a related civil case, even if that seizure prevents the defendant from hiring the attorney of his choice in the criminal case.[16] In *Caplin*, a criminal defendant was charged with running a massive drug impor-

---

**12.** 49 P.3d 262, 264 (Alaska 2002).

**13.** Judge Torrisi made this finding in his decision denying Cook's motion to continue the criminal case for prosecutorial misconduct.

**14.** *State v. Cook*, 265 P.3d 342, 346 (Alaska App. 2011).

**15.** The dissent argues that this court's opinion in *Armstrong v. Tanaka*, 228 P.3d 79 (Alaska 2010), should have compelled the superior court to "expressly consider" and balance Cook's Sixth Amendment rights against other interests when deciding Cook's motion. Dissent at 1084–85. But *Armstrong* involved a distinct question, and our holding in that case is inapposite. There, we

held that "when the plaintiff in a civil case is simultaneously defending himself in a related criminal case, *and he moves to stay civil proceedings to protect his right against self-incrimination,* the trial court must balance both parties' interests." *Id.* at 80 (emphasis added). Unlike the criminal defendant in *Armstrong*, Cook never argued to Judge Cutler that refusing to set aside the default judgment would impair his Sixth Amendment rights in the related criminal case. Thus, the dissent applies *Armstrong* beyond its predicate when it asserts that "*Armstrong* at a minimum requires" that "the judge consider[ ] the defendant's constitutional rights." Dissent at 1087 (original emphasis omitted).

**16.** 491 U.S. 617, 631, 109 S.Ct. 2646, 105 L.Ed.2d 528 (1989).

tation and distribution scheme.[17] The government sought to seize the proceeds from this enterprise under the federal drug forfeiture statute.[18] The government obtained a restraining order barring the defendant from transferring his potentially forfeitable assets.[19] Despite the order, the defendant paid a law firm $25,000 to represent him.[20] The defendant pleaded guilty in the criminal case, and the court seized virtually all of his assets.[21] The law firm petitioned the court to adjudicate the firm's rights to the funds.[22] After concluding that the federal forfeiture statute did not permit the defendant to use the contested funds to pay his attorneys, the Court concluded that the statute did not violate the defendant's Sixth Amendment rights.[23] The Court reasoned that the governmental interest in obtaining full recovery trumped the defendant's Sixth Amendment interest in using the contested assets to pay for his defense.[24] "A defendant has no Sixth Amendment right to spend another person's money for services rendered by an attorney, even if those funds are the only way that that defendant will be able to retain the attorney of his choice." [25]

7. The dissent objects to our reliance on the fact that neither Judge Cutler nor the State had any intent to interfere with Cook's exercise of his Sixth Amendment rights. The dissent maintains that it is "unaware of any authority … [stating] that a constitutional deprivation in the trial courts is without remedy unless the State or the court specifically intended that the constitution be violated." [26] But there is nothing new or improper about finding a constitutional deprivation only when the court intended to effect a deprivation. For example, the United States Supreme Court famously held in *Batson v. Kentucky*[27] that "[p]urposeful racial discrimination in selection of the [jury] venire violates a defendant's right to equal protection" but otherwise reaffirmed the general principle that the discriminatory impact of facially neutral practices in jury selection is not a violation of the Equal Protection Clause.[28] Indeed, as state actors, courts are often subject to the same motive inquiries that define prohibited state action more generally.[29] Motive is the determinative factor in many doctrines of constitutional law,[30] and

17. *Id.* at 619, 109 S.Ct. 2646.

18. *Id.* at 619–20, 109 S.Ct. 2646.

19. *Id.*

20. *Id.* at 620, 109 S.Ct. 2646.

21. *Id.* at 621, 109 S.Ct. 2646.

22. *Id.*

23. *Id.* at 622–33, 109 S.Ct. 2646.

24. *Id.* at 631, 109 S.Ct. 2646.

25. *Id.* at 626, 109 S.Ct. 2646.

26. Dissent at 1087–88.

27. 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986).

28. *Id.* at 86, 94, 106 S.Ct. 1712.

29. *See generally* Laurence H. Tribe, *The Mystery of Motive, Private and Public: Some Notes Inspired by the Problems of Hate Crime and Animal Sacrifice*, 1993 Sup.Ct. Rev. 1, 20 (noting that "this sort of inquiry into government motive … [cannot] automatically be confined to executive, or law-enforcement, actions" because "the Bill of Rights and the Fourteenth Amendment obviously

apply with equal force to *all* state action") (emphasis in the original).

Moreover, the dissent notes that "[w]hen reversing criminal convictions on constitutional grounds, this court never inquires whether the State or the trial court *intended* that the constitution be violated." Dissent at 1088 n. 76. This is true but inapposite. The dissent conflates review of a decision below, in which the relevant question is whether the court erred under the appropriate standard of review, with the distinct posture of the present case, in which the relevant question is whether an admittedly incorrect decision in a collateral civil case impermissibly burdened the defendant's exercise of his Sixth Amendment rights in the criminal case under review.

30. *See generally* Theodore Eisenberg, *Disproportionate Impact and Illicit Motive: Theories of Constitutional Adjudication*, 52 N.Y.U. L.Rev. 36, 38 (1977) ("Uneven impact and illicit motive have emerged as dominant themes in modern constitutional theory."); Caleb Nelson, *Judicial Review of Legislative Purpose*, 83 N.Y.U. L.Rev. 1784, 1789 (2008) (identifying the strong modern trend toward motive tests as "one of the most significant recent developments in American constitutional doctrine" and one that is now "widely accepted"); Gordon G. Young, *Justifying Motive Analysis in Judicial Review*, 17 Wm. & Mary Bill Rts. J. 191, 192 (2008) ("Despite occasional judi-

motive is especially relevant in this case: Unlike the dissent, our reliance on motive draws a clear line between prohibited and permissible state action. Every state action involving a person's money will foreseeably have an impact on that person's exercise of a constitutionally protected right, yet we do not require state actors to sua sponte balance those incidental impacts against other concerns in all such cases.[31]

8. Neither Cook nor the dissent cites any precedent for reopening a settled criminal case on Sixth Amendment grounds merely because, years later, an error was detected on appeal in a concurrent civil case that may have prevented the criminal defendant from accessing some of his assets. The cases Cook cites that have found Sixth Amendment violations are completely distinguishable because in those cases an order was issued *in the criminal case itself* that prevented the defendant's chosen attorney from participating in the criminal proceeding.[32] But in *Bell v. Todd,* the Tennessee Court of Appeals held that an erroneously entered default judgment in a related but separate civil case did *not* implicate a criminal defendant's Sixth Amendment rights because "[t]he right to retain counsel does not carry with it an entitlement to funds that have been sequestered by a court to secure the interests of a claimant or the public." [33]

9. We agree with the court of appeals that

under Cook's view of this issue, any judg[ment] directing a person to pay damages for a breach of contract, or to pay back taxes and penalties, or even to pay a fine as punishment for an unrelated crime, would be deemed an abridgement of that person's Sixth Amendment right to counsel of choice in a pending criminal case if (1) the person was forced to satisfy the judg[ment] (or, at least, forced to sequester funds to pay the judg[ment]), and (2) the person's lack of funds prevented the person from hiring a private attorney in the criminal case, or at least the particular private attorney the person would otherwise have chosen, and then (3) the money judg[ment] was later overturned because of a procedural error, or a mistaken evidentiary ruling, or an improper jury instruction.[34]

10. We conclude that finding a constitutional violation in such a case would subject the finality of criminal convictions to events outside the control of the judge or the parties to the criminal case. Here, the State was not a party to the civil suit and had no means of detecting or preventing reversible error in that case. Nor would a judge presiding over a criminal case have the power to protect against error in a related civil suit handled by a different judge.

11. Cook argues that the rule he proposes can be limited to the unique circumstances of his case. In particular, Cook argues that a constitutional error may be found in this

cial protestations, motive analysis pervades large parts of constitutional law.").

**31.** *See infra* ¶ 12.

**32.** *See, e.g., United States v. Gonzalez–Lopez,* 548 U.S. 140, 142–44, 126 S.Ct. 2557, 165 L.Ed.2d 409 (2006); *McKinnon v. State,* 526 P.2d 18, 21–24 (Alaska 1974); *Klockenbrink v. State,* 472 P.2d 958, 963–66 (Alaska 1970); *Daniels v. State,* 17 P.3d 75, 82–84 (Alaska App.2001).

**33.** 206 S.W.3d 86, 95 (Tenn.App.2005) (citing *Caplin & Drysdale, Chartered v. United States,* 491 U.S. 617, 624–33, 109 S.Ct. 2646, 105 L.Ed.2d 528 (1989); *United States v. Monsanto,* 491 U.S. 600, 616, 109 S.Ct. 2657, 105 L.Ed.2d 512 (1989)). The dissent argues that the federal asset forfeiture cases following *Caplin* require a post-deprivation, pre-trial hearing to "show probable cause that the assets were forfeitable," and that

Cook "never had the opportunity to challenge the Estate's hold on his assets before he was convicted of murder in a trial in which he lacked his counsel of choice." Dissent at 1085 n. 67. But Cook does not argue that he was deprived of his procedural due process rights. Indeed, Cook appeared in the civil case in order to challenge the entry of default judgment, filing a motion to set aside the judgment, an affidavit in support of the motion, and a reply to plaintiff's opposition to the motion. The crux of his argument is not that the superior court violated due process by not providing him with an adequate opportunity to be heard, but rather that the superior court substantively violated the Sixth Amendment by failing to balance his interests related to the criminal case against the countervailing interests at issue in the civil case.

**34.** *State v. Cook,* 265 P.3d 342, 347 (Alaska App. 2011).

case because the civil and criminal proceedings were closely related. But we see no principled way to protect the finality of criminal convictions by limiting this case to its facts. The fact that the same judge presided over both the civil and criminal proceedings for a period of time in this case is irrelevant to Cook's broader legal argument that he was deprived of his Sixth Amendment rights. Under Cook's argument, a judge commits constitutional error as a state actor whenever an error in the civil case restricts a party's ability to hire his preferred attorney, regardless of who presides over the criminal case. Nor is the fact that the civil and criminal trials in this case stemmed from the same alleged act pertinent to Cook's constitutional analysis. The subject matter of the civil or criminal case cannot possibly be relevant to the question whether an error in the civil case has limited a criminal defendant's ability to hire the attorney of his choice. The only relevant issue is whether that error prevented the defendant from accessing his funds. Under Cook's constitutional interpretation, any such error in a civil case—closely related or not—would violate a defendant's Sixth Amendment rights in the criminal case if it prevented the defendant from accessing the funds necessary to hire the attorney of his choice. Therefore, although the civil and criminal cases happened to arise out of the same conduct by Cook and were briefly before the same judge in this case, those facts are not a useful way to distinguish future cases. If we conclude that the error in the civil case violated Cook's Sixth Amendment rights we must also conclude, as the court of appeals did, that "a criminal defendant's Sixth Amendment rights would be violated by *any* judg[ment] or order in *any* proceeding if that judg[ment] or order deprived the defendant of the funds necessary to hire a private attorney in a pending criminal case, and if the judg[ment] or order was later overturned for any reason in a subsequent appeal, or in a motion for relief from judg[ment]." [35]

12. Although the dissent predicts that the "unusual facts of this case" will be "unlikely to arise again," [36] the logic of the dissent's proposed rule would extend far beyond its factual predicate. The U.S. Supreme Court recognized this line-drawing problem and cited it as support for its holding in *Caplin*, asking rhetorically:

> If defendants have a right to spend forfeitable assets on attorney's fees, why not on exercises of the right to speak, practice one's religion, or travel? ... The full exercise of these rights, too, depends in part on one's financial wherewithal; and forfeiture ... may similarly prevent a defendant from enjoying these rights as fully as he might otherwise. Nonetheless, we are not about to recognize an antiforfeiture exception for the exercise of each such right; nor does one exist for the exercise of the Sixth Amendment rights.[37]

Similarly, in the present case, if a defendant has a right to have a court weigh, sua sponte, the effects of a civil judgment on the defendant's ability to procure a lawyer of his choice in a parallel criminal case presided over by the same judge, then why not in a nonparallel case or one presided over by a different judge? Moreover, why would entering judgment in *any* civil matter without considering the effect of the judgment on the losing party's ability to exercise *any* constitutionally protected right not impermissibly burden that right? Finding no principled stopping point for such a sua sponte duty on state actors to consider incidental burdens on constitutional rights, we prefer the improper-motive inquiry announced in this order. It adequately protects against unconstitutional penalties sought by intentional bad actors without presenting intractable line-drawing problems.

13. Therefore, the Petition for Hearing, filed on January 18, 2012 and granted on June 5, 2012, is DISMISSED as improvidently granted.

Entered by direction of the court.

BOLGER, Justice, not participating.

---

**35.** *Id.* (emphasis in original).

**36.** Dissent at 1083 n. 52.

**37.** *Caplin,* 491 U.S. at 628, 109 S.Ct. 2646.

MAASSEN, Justice, with whom
STOWERS, Justice, joins, dissenting.

I respectfully dissent from the court's dismissal of Kim Michael Cook's petition for hearing. In my opinion, Cook's Sixth Amendment right to counsel[1] was not given the express consideration that the Constitution requires when the superior court denied him access to the funds he needed to retain the lawyer of his choice. This was "structural error" that leaves no option but a new trial, as Superior Court Judge Eric Smith correctly concluded in deciding Cook's petition for post-conviction relief. The court of appeals' opinion reversing Judge Smith's order[2] is flawed and should be reversed.

## I. BACKGROUND

### A. Underlying Facts

In the early morning of May 15, 1999, Palmer Police Officer James Rowland approached a parked pickup truck to check on the driver, who appeared to be slumped over the steering wheel.[3] The driver was Cook. The encounter devolved into a struggle in which Officer Rowland and Cook shot each other. Officer Rowland was killed; Cook survived with two gunshot wounds to the chest.[4]

Cook was charged with first-degree murder.[5] He underwent two surgeries for his wounds and was hospitalized for over a week before being moved to a maximum security cell.[6] Criminal and civil cases were filed against him almost immediately and proceeded concurrently in Palmer superior court.

### B. Civil Proceedings

Officer Rowland's widow, as personal representative of his estate ("the Estate"), filed suit against Cook on May 27, 1999, just 12 days after the shooting, seeking recovery under the survival and wrongful death statutes.[7] Cook, by then in the Palmer jail, received the complaint the next day from a corrections officer but did not respond. In *Rowland*, this Court described his circumstances at the time:

> Cook was served with this lawsuit within two weeks of suffering multiple serious gunshot wounds. As a result, his claims that he underwent extensive medical treatment and was heavily medicated appear legitimate. In addition to his physical incapacitation, Cook was being held in a confined setting which allowed him minimal contact with the outside world. He was engaged in and likely preoccupied with defense of the extremely serious criminal charges filed against him.[8]

On June 18, a day after Cook's answer was due, the Estate applied for entry of default; the clerk signed the order that day. The next weekday, June 21, the Estate requested that the court set a hearing "to establish damages for entry of final judgment ... at the court's earliest possible convenience," predicting "that most of the evidence will be submitted in affidavit form and[,] with minimal testimony, this hearing should not exceed twenty minutes." On June 24, a Thursday, the Estate changed its request to entry of a default judgment without a hearing, supporting its request with the affidavits of an economist and of Officer Rowland's widow. The following Monday, June 28, the superior court signed the Estate's proposed judgment in the requested amount of just over $7 million,[9] which included $1,753,975 in compensatory damages and $5,261,925 in punitive damages. This was a remarkably

1. U.S. Const. amend. VI. Article I, section 11 of the Alaska Constitution may afford greater protection in this case than the Sixth Amendment, as it does in some other contexts. *See Forster v. State*, 236 P.3d 1157, 1169 (Alaska App.2010).

2. *See State v. Cook*, 265 P.3d 342 (Alaska App. 2011) (hereinafter *Cook II* ).

3. *Cook v. Rowland*, 49 P.3d 262, 263 (Alaska 2002) (hereinafter *Rowland* ); *Cook II*, 265 P.3d at 343.

4. *Rowland*, 49 P.3d at 263.

5. *Id.*

6. *Id.*

7. *See* AS 09.55.570 (survival); AS 09.55.580 (wrongful death).

8. 49 P.3d at 265.

9. *Id.* at 263.

speedy resolution for a case filed 31 days before.[10]

A few days later, having acquired information about Cook's assets from the prosecutor in the pending criminal case, the Estate froze all the assets it could reach. By July 13 the Estate had frozen approximately $300,000 of Cook's funds.[11] Cook had not received notice of the entry of default or of the default judgment, despite the fact that both the Estate and the court certainly knew that he continued to be detained in the Palmer jail.

On July 21 Cook appeared (on paper) for the first time in the civil suit, moving pro se to set aside the default judgment and filing a peremptory challenge of the judge.[12] The court scheduled an evidentiary hearing for September on the motion to set aside the default judgment and denied the peremptory challenge as untimely.[13] Cook informed the court and the Estate that he could not arrange for transportation from his maximum security cell to attend the hearing. But on September 15 the court proceeded with the hearing in his absence and denied the motion to set aside the default.[14] Cook's assets remained frozen.[15]

In December 1999 Cook filed a motion to stay execution of judgment pending his appeal to this court. The superior court denied that motion as well. Cook argued on appeal that the superior court had erred both in rejecting his peremptory challenge and in denying his motion to set aside the default judgment.[16] He submitted two requests to expedite the appeal, asking for a decision before his criminal trial so that he could have access to his funds to hire a criminal lawyer. This court denied his requests, and in Octo-ber 2000, while his civil appeal was pending, Cook was convicted of the first-degree murder of Officer Rowland.[17]

In June 2002 this court decided Cook's civil appeal, holding that the superior court had abused its discretion in refusing to set aside the default judgment.[18] In a per curiam opinion, the court held that Cook had demonstrated excusable neglect and good cause to set the judgment aside.[19] But because Cook had by then been convicted of Officer Rowland's murder, the court observed that he could not "deny liability" for the death in the civil case.[20] The court nonetheless held that Cook had demonstrated "a potentially meritorious defense" with regard to damages, as they "might be lower if he were allowed to participate in a damages hearing."[21] Lastly, a plurality of the court held that Cook's peremptory challenge of the superior court judge should be given effect on remand.[22]

The wrongful death case never went to trial; the parties settled the case, the Estate keeping the assets it had frozen several years before and agreeing not to pursue any more damages.[23]

## C. Criminal Proceedings

### 1. Original proceedings

The criminal prosecution proceeded concurrently with the civil suit. On May 22, 1999, Cook faced arraignment and told the magistrate that he wanted to retain a private attorney, had one in mind, but needed a public defender to help make the contact. The magistrate appointed the Public Defender Agency to represent Cook in the interim. On May 28, the day he received the civil

---

10. In 2003, the first year for which the Alaska Court System can perform a reliable computerized search of such data, the average time to disposition of a case filed in Palmer and resolved by default was 169 days.

11. *Cook II*, 265 P.3d 342, 344 (Alaska App.2011).

12. *Rowland*, 49 P.3d at 263.

13. *Id.*

14. *Id.* at 263–64; *Cook II*, 265 P.3d at 344.

15. *Cook II*, 265 P.3d at 344.

16. *Rowland*, 49 P.3d at 264.

17. *Cook II*, 265 P.3d at 344.

18. *Rowland*, 49 P.3d at 264.

19. *Id.* at 264–65.

20. *Id.* at 266.

21. *Id.*

22. *Id.* at 267.

23. *Cook II*, 265 P.3d 342, 344 (Alaska App.2011).

complaint, Cook appeared with a public defender for his continued arraignment before the same superior court judge assigned to the Estate's civil case. Cook informed the court that he had not been permitted "phone calls to get a lawyer." The court observed that "it sounds from what [Cook's] saying like he may in fact have property and assets" but advised him to fill out the application for a public defender so that the court could determine whether he was entitled to one. The court explained that the application would include "a confidential affidavit" about his finances, which the court assured him could not be accessed by "the general public."

Cook did not complete the public defender application, and the court held a representation hearing on June 22 (four days after default had been entered in the civil case, unbeknownst to Cook). The State submitted a "Response to Defendant's Request for Appointed Counsel," including two exhibits that listed Cook's monetary assets, information from a state trooper investigation. At the outset of the hearing the court noted that Cook "really might have some finances to be concerned with," a belief the court based on "an unusual statement [Cook] made" to his public defender at the arraignment about "probably need[ing] an accountant before he could answer questions about his finances." A public defender again spoke on Cook's behalf, informing the court that Cook had not filled out the public defender application because he believed that "he has sufficient assets in order to hire private counsel." The public defender also asked the court to seal Cook's financial information, which the State had filed that day as a public document. The court agreed that the information should be confidential, noting that "it goes into a sealed envelope like the financial application would."

Cook then spoke for himself. He explained to the court that he had "been put in a really impossible situation" because "ever since I've been arrested I've been in maximum security and I haven't been allowed any phone calls, so how can I obtain a lawyer?" The court explained that "there's just a presumption that most people can get to their own assets and ... get to a telephone even if they're in jail," but it issued a temporary order allowing Cook to make phone calls from jail at his own expense. Cook also asked that a different judge preside over his criminal case, a request the court granted. Finally, the public defender noted on the record that he was going to "facilitate getting [the state's exhibits showing Cook's assets] to the attorneys who've expressed an interest in the case and to whom Mr. Cook's expressed an interest in hiring, and I think that's a reasonable thing to do under the circumstances."

Before the representation hearing, these financial documents had already been shared with the private lawyer representing the Estate in the civil suit. He was in the courtroom during the representation hearing, where he presumably heard Cook and his public defender explain that Cook hoped to use his funds as soon as possible for the hiring of private counsel for his criminal defense. It was two days later that the Estate, in the civil case, changed its request for a hearing on the default judgment to a request for entry of judgment without a hearing, and it was another two working days later that the same judge who had presided over the initial hearings in Cook's criminal case signed the civil judgment.

Cook met with a criminal defense attorney, James McComas, on June 20, 21, 23, and 24. On June 24 McComas agreed to represent Cook in the criminal case conditioned on his receipt of a $200,000 retainer.[24] McComas instructed his investigator to begin collecting Cook's assets as soon as possible. The investigator did so no later than July 2 but discovered that the assets had all been frozen.[25] The investigator relayed this information to McComas, who had been unaware of the civil

---

**24.** *Id.*

**25.** A portion of Cook's assets—$92,000 in a safety deposit box located in Washington—remained available until March 13, 2000. Cook testified that he assumed the deposit box had been frozen; he asked the public defenders to help him confirm that belief; but the public defenders refused to help. McComas testified by affidavit that the funds in the deposit box were less than he needed for the retainer and would not have sufficed to retain his services.

suit and the $7 million default judgment already entered against Cook. McComas informed Cook that without the retainer he could not represent him.

At the next pretrial conference in his criminal case, Cook informed the court that his assets were unavailable to him and he would need representation by the public defender after all. The State did not oppose the request, and the court appointed the Public Defender Agency.

Several months later Cook moved for a continuance of his criminal trial on grounds that the State had deprived him of his Sixth Amendment right to counsel of his choice when it improperly shared his confidential financial information with the Estate's private lawyer. As a remedy, Cook proposed that the court dismiss the criminal charges without prejudice until his civil appeal was decided; this would afford him the opportunity to hire defense counsel of his choice if the appeal succeeded and the default judgment were vacated. The superior court judge who had taken over Cook's criminal case denied his motion.

In October 2000 Cook went on trial on the criminal charges, represented by the Public Defender Agency.[26] His relationship with his appointed lawyers deteriorated quickly, and several days into trial he decided to proceed without them.[27] His defense was that "he had acted in self-defense or, alternatively, in the heat of passion."[28] The jury convicted him of first-degree murder.[29] It is this conviction—secured in a proceeding in which Cook lacked counsel of his choice—that this court held in *Rowland* collaterally estopped Cook from contesting liability for Rowland's death in the civil case, the case which deprived Cook of the funds he needed to secure counsel of his choice in the criminal case.[30] The court of appeals affirmed the criminal conviction in 2004.[31]

### 2. Post-conviction relief

In 2005 Cook applied for post-conviction relief, claiming among other things that his right to counsel had been violated. His claims were eventually narrowed to just the Sixth Amendment claim, and the parties stipulated to the relevant facts in lieu of an evidentiary hearing. In August 2008 Judge Smith granted Cook's petition for post-conviction relief, set aside his conviction, and ordered a new criminal trial.[32] He found that this court's decision in *Rowland*,[33] holding that the default judgment against Cook should have been set aside, was a new material fact for purposes of post-conviction relief; that the default judgment had prevented Cook from hiring McComas; and that actions of the State thus violated Cook's "constitutional right to choose his own attorney."[34] Judge Smith agreed with both parties that based on these holdings Cook was entitled to a new trial even though he could no longer pay for his own counsel.

The State appealed the decision to the court of appeals, which reversed.[35] The court of appeals held that "no Sixth Amendment implications" stemmed from the fact that the civil default judgment indirectly prevented Cook from retaining McComas, because interfering with the right to counsel had been only a collateral effect of the court's ruling, not its purpose.[36] The court reasoned that holding otherwise would have an untenable policy effect because any order in any proceeding could be deemed a Sixth Amend-

---

**26.** *Cook v. State,* Mem. Op. & J. No. 4847, 2004 WL 719771 at *4 (Alaska App., Mar. 31, 2004) (hereinafter *Cook I* ).

**27.** *Id.* at *7.

**28.** *Id.* at * 1.

**29.** *Id.*

**30.** 49 P.3d 262, 266 (Alaska 2002).

**31.** *Cook I,* 2004 WL 719771 at * 1; *see also Cook II,* 265 P.3d 342, 344 n. 4 (Alaska App.2011) (citing *Cook I,* 2004 WL 719771 at * 1).

**32.** *Cook II,* 265 P.3d at 344–45.

**33.** 49 P.3d 262 (Alaska 2002).

**34.** *See also Cook II,* 265 P.3d at 345.

**35.** *Id.* at 348.

**36.** *Id.* at 345.

ment violation in a separate criminal case.[37] The court observed that the United States Supreme Court[38] and this court[39] have adopted the structural error approach, by which any Sixth Amendment violation requires that the case be retried;[40] but it held that the approach does not apply in this case because it is intended to be a deterrent to constitutional error, and the superior court judge in Cook's civil case could not have been deterred from interfering with his Sixth Amendment rights because they were not legally relevant to the motion before her, which involved only the question of whether there was good cause to set the default judgment aside.[41]

Cook filed a petition for hearing, and it was granted. The Court now concludes that its grant of the petition was improvident and dismisses it.

## II. DISCUSSION

Several general observations influence this analysis.[42] First, Officer Rowland's murder was a catastrophic event in Palmer, a small town. The officer was well-liked, the married father of an infant son, and the first officer killed in the line of duty in the history of the small department. His murder was highly publicized, and the resulting court proceedings were closely watched.[43]

Second, the speed with which the Estate's civil case against Cook proceeded—from the filing of the complaint to the entry of final judgment in excess of $7 million—was remarkable. During that 31–day period, the Estate moved for the entry of default, moved for the entry of judgment without a hearing, requested a writ of execution, and filed an amended judgment; the court acted on every filing either on the day it was made or no more than two business days later. This speedy justice is atypical, even in the court system at its most efficient. From the day the civil suit was filed, the Estate was essentially in a race with Cook for access to his money. The court system's extraordinary efficiency helped ensure that Cook's assets ended up in the hands of Officer Rowland's family before they could be expended on his defense. This may well be where those assets rightly belonged; but it should not have happened before due consideration of Cook's Sixth Amendment rights, something that did not occur. To a disinterested observer it must appear that the court was taking sides in the race between Cook and the Estate at a time when it was vitally important for the court to act with deliberate and obvious impartiality.

Third, it is difficult to consider the retrial of a murder case 14 years after the event. Justice is less certain with the passage of time. The burden on the State if a retrial were ordered would no doubt be great. The burden on family members, colleagues, and witnesses who are called upon to revisit that sad day would be even greater. It is a result to be approached with caution and regret.

### A. Cook Had A Sixth Amendment Right To Counsel Of His Choice.

The Sixth Amendment of the United States Constitution provides that "[i]n all criminal prosecutions, the accused shall enjoy the right ... to have the Assistance of Counsel for his defence."[44] The right to

---

**37.** *Id.* at 347.

**38.** *See United States v. Gonzalez–Lopez*, 548 U.S. 140, 126 S.Ct. 2557, 165 L.Ed.2d 409 (2006).

**39.** *See McKinnon v. State*, 526 P.2d 18 (Alaska 1974).

**40.** *Cook II*, 265 P.3d at 347–48 (citing *Gonzalez–Lopez*, 548 U.S. at 148, 150–51, 126 S.Ct. 2557; *McKinnon*, 526 P.2d at 23–24).

**41.** *Id.* at 347–48.

**42.** *See, e.g.*, Alaska R. Evid. 201(b) (providing for judicial notice of facts that are "either (1) generally known within this state or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned").

**43.** The record reflects this. At the close of Cook's arraignment on May 28, the court referred to "the individuals who are here with electronic equipment" who were trying to leave the courtroom before the other arraignments got underway. At Cook's representation hearing, the court noted at one point, "I really wasn't expecting quite so many people in the courtroom."

**44.** U.S. Const amend. VI.

counsel includes the right to counsel of choice: "[T]he Sixth Amendment guarantees a defendant the right to be represented by an otherwise qualified attorney whom that defendant can afford to hire, or who is willing to represent the defendant even though he is without funds."[45] Like all individual rights, the right to counsel of choice is reasonably circumscribed. "In a nutshell, the Sixth Amendment protects against unjustified governmental interference with the right to defend oneself using whatever assets one has or might reasonably and lawfully obtain."[46] The defendant must be able to afford his counsel of choice; if he instead requires appointed counsel, then, of course, he loses the right to choose which lawyer will represent him.[47]

### B. Cook Was Wrongly Denied Access To The Funds He Needed To Retain His Counsel Of Choice.

The error this court identified in *Rowland* was not the superior court's entry of the default judgment but rather its failure to set the judgment aside on Cook's motion; *Rowland* held that Cook had shown both excusable neglect and a meritorious defense to damages.[48] When Cook's motion was denied in September 1999, most of his recoverable assets had been frozen. Had the superior court granted Cook's motion and thus avoided reversible error, the Estate's hold on his

assets would have been released.[49] Cook would have had access to the funds he needed to retain his counsel of choice. As Judge Smith found after a discussion of the evidence: "In short, the reason Mr. Cook could not use his money to pay Mr. McComas was because the default judgment blocked him from doing so." The court of appeals accepted this finding of fact.[50]

Not all interference with a defendant's right to counsel is unconstitutional; the Sixth Amendment protects against *unjustified* interference,[51] and it is only a violation of the Sixth Amendment that could provide the new trial Cook seeks in his petition. The question is thus whether the superior court's interference with Cook's right to counsel was justified. I conclude that it was not, because the court failed to expressly consider the effect its ruling likely had on Cook's exercise of his constitutional rights in the criminal proceeding, an issue which he had repeatedly raised and of which the court was otherwise aware—not just constructively aware, as an abstract and incorporeal institution, but actually aware, in the person of the individual judge who happened to be presiding over both cases.[52]

The court of appeals concluded that the superior court's erroneous ruling on the default judgment in the civil case "should not be deemed a violation of Cook's Sixth

45. *Caplin & Drysdale, Chartered v. United States,* 491 U.S. 617, 624–25, 109 S.Ct. 2646, 105 L.Ed.2d 528 (1989).

46. *United States v. Stein,* 541 F.3d 130, 156 (2d Cir.2008).

47. *See United States v. Gonzalez–Lopez,* 548 U.S. 140, 151–52, 126 S.Ct. 2557, 165 L.Ed.2d 409 (2006); *Wheat v. United States,* 486 U.S. 153, 159–60, 108 S.Ct. 1692, 100 L.Ed.2d 140 (1988).

48. 49 P.3d 262, 264–66 (Alaska 2002).

49. This court observed in *Rowland* that it would be "just" for the superior court on remand to allow the plaintiff to retain the seized property as a condition of setting aside the default. 49 P.3d at 267. But this observation post-dated Cook's murder conviction, meaning that Cook was collaterally estopped from contesting liability in the civil case, leaving only the amount of damages at issue. *Id.* at 266 67. I assume that this court would have been less likely to endorse prejudg-

ment attachment if Cook's liability had still been at issue.

50. The court of appeals had reservations about whether Cook would actually have been able to retain McComas for the duration of the criminal proceedings, but it did not hold that Judge Smith's factual findings were clearly erroneous; those findings therefore stand. *See Cook II,* 265 P.3d at 346.

51. *Stein,* 541 F.3d at 156.

52. Today's order dismissing the petition concludes that it is "irrelevant" that "the same judge presided over both the civil and criminal proceedings for a period of time in this case." Order, ¶ 11. The fact is highly relevant. It also makes the situation we address here unlikely to arise again, despite the order's prediction that ordering a retrial in Cook's case would lead to a rash of Sixth Amendment claims based on incidental rulings in unrelated cases. The unusual facts of this case are important to its resolution.

Amendment right to choose his attorney" because the ruling's effect on his criminal case was "not the point of the superior court's decision" but rather was merely a "collateral effect": "[T]he court's purpose was to adjudicate the competing interests of the parties in [the] civil lawsuit." [53] The court of appeals continued:

> It is true that when the superior court denied Cook's motion to set aside the default judgement, one collateral effect of the superior court's ruling was that Cook failed to regain control of his assets—thus leaving Cook without the financial ability to hire the private defense attorney that Cook wanted to represent him in the criminal case. But this was not the point of the superior court's decision—nor (as far as the record reveals) *was this even taken into consideration by the superior court* when the court denied Cook's motion for relief from his default.[54]

This court has held, however, that a superior court *must* take into account the "collateral effect" of its rulings on a party's exercise of constitutional rights in a parallel criminal proceeding; a purpose solely to "adjudicate the competing interests of the parties in [the] civil lawsuit" is too narrow when the court knows that other vital interests are at stake.[55] And the court's failure to take the party's constitutional rights into consideration is not an ameliorating factor, as the court of appeals suggests, but is rather the very error that demands redress.

The general principles that apply to this case are the same ones this court discussed in *Armstrong v. Tanaka*.[56] The plaintiff in that case, Armstrong, had given a 14–year-old child "an explicitly sexual and violent book," and the child's father reported him to the police.[57] The Municipality of Anchorage brought charges against Armstrong for disseminating indecent materials to a minor but soon dismissed them, and Armstrong then brought a defamation suit against the child's father.[58] While this civil suit was pending, the State brought child pornography charges against Armstrong.[59] When the father sought discovery, Armstrong refused to answer some questions on Fifth Amendment grounds, then sought to stay the civil case pending resolution of the criminal charges against him.[60] The superior court denied his motion and dismissed his suit as a discovery sanction.[61]

This court vacated the order denying the stay, vacated the dismissal of Armstrong's lawsuit, and remanded the case for a balancing of "all parties' interests," to include "[a]t a minimum ... the plaintiff's right to assert [the] Fifth Amendment privilege without penalty and his right of access to the courts against the defendant's right to defend himself against the plaintiff's allegations and interest in timely resolution of the proceedings against him." [62] It held that "[d]ue to the importance of the rights involved, the superior court must *expressly consider* all parties' interests before ruling on a motion to stay." [63] This court did not predetermine the result of the balancing that was to occur on remand; the reason for remand was simply the *absence* of any balancing. "[W]ithout the benefit of the rule we adopt today, the superior court did not expressly conduct a balancing of the parties' interests before denying Armstrong's motion to stay." [64] It acknowledged that the superior court, after following the proper procedure, could still find that a stay of civil proceedings was not appropriate, in which case it would be "free to fashion another remedy to achieve the proper bal-

---

53. *Cook II*, 265 P.3d at 346.

54. *Id.* (emphasis added).

55. *Cook II*, 265 P.3d at 346.

56. 228 P.3d 79 (Alaska 2010).

57. *Id.* at 81.

58. *Id.*

59. *Id.*

60. *Id.*

61. *Id.* at 81–82.

62. *Id.* at 85.

63. *Id.* at 85 (emphasis added).

64. *Id.*

ance." [65] But "balance" was the watchword, and an express weighing of Armstrong's constitutional rights in that balance was the requisite for constitutionality.[66]

The same analysis applies to this case. The Sixth Amendment right to counsel is no less important than the Fifth Amendment right at issue in *Armstrong*. The superior court's purpose in *Armstrong* was to adjudicate the defendant's right to discovery in the civil case, but that did not mean it was free to ignore the effect of its ruling on the parallel criminal case. The same is true here. "Due to the importance of the rights involved, the superior court [should have] expressly consider[ed] all parties' interests before ruling on" any motion affecting the Estate's ability to continue its hold on Cook's assets. That would include, "at a minimum," Cook's Sixth Amendment right to his counsel of choice in addition to the Estate's "interest in timely resolution of the [civil] proceedings." [67]

The court of appeals predicted that requiring courts to consider the collateral effects of their rulings on pending criminal cases would unleash a parade of horribles (a view today's

---

**65.** *Id.* at 86.

**66.** This court has held in other cases that judges are required to consider how their civil rulings affect parties' exercise of their constitutional rights in parallel criminal proceedings. *See Resek v. State*, 706 P.2d 288, 294 (Alaska 1985) (requiring that courts in civil forfeiture actions recognize the risks of self-incrimination when there are ongoing criminal prosecutions and instructing courts to stay the forfeiture actions "in the absence of strong countervailing circumstances"); *McCracken v. Corey*, 612 P.2d 990, 998 (Alaska 1980) (holding that a court in a parole revocation hearing occurring before the criminal trial must inform the defendant of the scope of immunity given to his testimony, i.e., that the testimony and its fruits will not be used against him in the later proceeding). The issue addressed in *Resek*—whether to stay a civil proceeding in deference to a parallel criminal proceeding—is frequently addressed by other courts; as in *Armstrong*, the decision involves balancing the competing interests. Weighed in the balance among other factors is "the hardship on the defendant, including the burden on the defendant if the cases go forward in tandem." *Bell v. Todd*, 206 S.W.3d 86, 94 (Tenn.App.2005) (citing *Microfinancial, Inc. v. Premier Holidays Int'l, Inc.*, 385 F.3d 72, 77 (1st Cir.2004); *Maloney v. Gordon*, 328 F.Supp.2d 508, 511 (D.Del.2004)). *See also State Farm Mut. Auto. Ins. Co. v. CPT Med. Servs., P.C.*, 375 F.Supp.2d 141, 157 n. 8 (E.D.N.Y.2005) (noting that "the private interests of and burden on the defendant" should be considered (quoting *United States v. Private Sanitation Indus. Ass'n of Nassau/Suffolk, Inc.*, 811 F.Supp. 802, 805 (E.D.N.Y.1992)) (internal quotation marks omitted)); *King v. Olympic Pipeline Co.*, 104 Wash.App. 338, 16 P.3d 45, 58 (2000) (holding that "the burden which any particular aspect of the proceedings may impose on defendants" should be considered (quoting *Fed. Sav. & Loan Ins. Corp. v. Molinaro*, 889 F.2d 899, 903 (9th Cir.1989)) (internal quotation marks omitted)).

**67.** Today's order dismissing Cook's petition cites *Caplin & Drysdale, Chartered v. United States*, 491 U.S. 617, 626, 109 S.Ct. 2646, 105 L.Ed.2d 528 (1989), in support of the undebatable proposition that the Sixth Amendment does not give a defendant the right to spend assets that have been lawfully seized in a separate proceeding. *See* Order, ¶ 4. But subsequent federal cases have emphasized that in order to protect the defendant's Sixth Amendment rights, that separate proceeding, whether criminal or civil, must include an adversary hearing in which the government is required to show probable cause that the assets were forfeitable. *See United States v. E-Gold, Ltd.*, 521 F.3d 411, 421 (D.C.Cir.2008) ("[W]e hold that where the government has obtained a seizure warrant depriving defendants of assets pending a trial upon the merits, the constitutional right to due process of law entitles defendants to an opportunity to be heard at least where access to the assets is necessary for an effective exercise of the Sixth Amendment right to counsel."); *United States v. Monsanto*, 924 F.2d 1186, 1203 (2d Cir.1991) ("We conclude that (1) the fifth and sixth amendments, considered in combination, require an adversary, post-restraint, pretrial hearing as to probable cause that (a) the defendant committed crimes that provide a basis for forfeiture, and (b) the properties specified as forfeitable in the indictment are properly forfeitable."); *United States v. Michelle's Lounge*, 39 F.3d 684, 700–01 (7th Cir. 1994) ("[D]ue process requires the government to participate in a post-seizure adversary hearing on probable cause when the district court has found that the government has seized through civil forfeiture all of the assets a criminal defendant needs to obtain counsel."). The analogy between this case and a federal forfeiture proceeding is inexact. But federal law does require greater attention to the defendant's Sixth Amendment rights than Cook received here, where the court's erroneous denial of his motion to set aside the default judgment meant that he never had the opportunity to challenge the Estate's hold on his assets before he had been convicted of murder in a trial in which he lacked his counsel of choice.

order endorses [68]):

> Under [Cook's] reasoning, a criminal defendant's Sixth Amendment rights would be violated by *any* judgement or order in *any* proceeding if that judgement or order deprived the defendant of the funds necessary to hire a private attorney in a pending criminal case, and if the judgement or order was later overturned for any reason in a subsequent appeal, or in a motion for relief from the judgement.[69]

But not only did the same judge preside over both the civil and criminal proceedings in this case, those two proceedings centered on the defendant's responsibility—civil and criminal—for the same alleged act. A decision that affords redress in Cook's case need hardly extend to *"any* judgement or order in *any* proceeding."* The alignment of events in Cook's case is unlikely to be repeated.

Furthermore, as the court of appeals also noted, Cook "concedes that he would have no Sixth Amendment claim if the superior court had *rightfully* denied his motion to set aside the default judgement." [70] A "rightful" denial would have had to be both procedurally correct *and* constitutional. While the superior court certainly erred procedurally in failing to set aside the default judgment (as this court held in *Rowland* ), the procedural error arose to the level of a constitutional violation only because in denying Cook's motion the superior court failed to give any consideration at all to Cook's Sixth Amendment rights.[71] The denial could have been a procedural error without being a constitutional error. Here it was both.

In other words, a constitutionally compliant hearing on Cook's motion to set aside the default would have expressly considered Cook's adamant and repeated claim that he needed access to his funds in order to secure his counsel of choice in the criminal case. The superior court may still have denied the

motion; if so, this court would still have reversed that denial as procedurally erroneous, given the fact that Cook had demonstrated excusable neglect and a meritorious defense. But the superior court's denial of the motion under those circumstances might not have constituted a violation of Cook's Sixth Amendment rights entitling him to a new trial. The principles this court stated in *Armstrong* require *express consideration* and *balancing;* they do not require that the constitutional rights invariably win the balance as against the competing interests of other litigants like the Estate.

I am also unmoved by the court of appeals' observation that the effect of a civil ruling on the proceedings in a criminal case will often be "wholly fortuitous" because the judge in the civil case "is normally trying to adjudicate the matter before the court—and not thinking about the possibility that, if a money judgement is ultimately entered against the defendant at the end of the proceeding, this money judgement might hinder or prevent the defendant from hiring [his] counsel of choice in a separate criminal case." [72] That may be true as a general matter, but if the superior court is truly "not thinking about the possibility" of Sixth Amendment repercussions, it is because the issue has not been raised; and if the issue has not been raised, it is seldom error for the court not to think about it. That is not the case here. That the superior court judge was aware of Cook's efforts to get access to his funds so that he could retain his counsel of choice is not subject to serious debate. The same judge had presided over the representation hearing at which both Cook and his public defender informed her that he intended to hire private counsel, that he had funds with which to do it, and that he was having difficulty accessing those funds because of his confinement. At that hearing the judge learned that Cook's public defender was already concerned about

---

**68.** Order, ¶ 11

**69.** *Cook II,* 265 P.3d 342, 347 (Alaska App.2011) (emphasis in original).

**70.** *Id.* (emphasis in original).

**71.** I agree with the court of appeals' observation that, "as far as the record reveals," the fact that

Cook would be left "without the financial ability to hire the private defense attorney that Cook wanted to represent him in the criminal case ... [was not] even taken into consideration by the superior court when the court denied Cook's motion for relief from his default." *Id.* at 346.

**72.** *Id.* at 347.

the fact that his client's confidential financial information had been made publicly available. Less than a week later, the same judge signed the default judgment in the civil case in an amount that was certain to destroy whatever liquidity Cook had. And after that time, Cook repeatedly complained in the civil case about the effect of the default judgment on his ability to retain private counsel. In an affidavit submitted with his motion to set aside the default, dated July 19, Cook attested, "I can't afford to pay a lawyer for the civil case, because I now understand that my money is being frozen and/or taken away from me because a judgment has been entered against me." In his August 11 reply to the Estate's opposition, he argued that the prosecution's sharing of his financial information with the Estate's lawyer violated criminal statutes and "has made it impossible for him to obtain the legal counsel of his choice." In a handwritten response to the court's order scheduling a hearing on his motion to set aside the default and denying his peremptory challenge, dated September 10, he wrote, "I cont[i]nue to represent myself [due] to the default judgment and the freezing of my funds. I have no access to my money to hire an attorney." While some of these complaints in the civil case are directed to his inability to hire counsel *in the civil case*, the superior court was certainly on notice that the problem encompassed the criminal case as well.[73]

To repeat, I am not suggesting that it would be error for a court in a civil case to fail to consider the effect of its ruling on a party's Sixth Amendment rights if the party never raised the issue. Sixth Amendment rights may be waived if not asserted.[74] For example, a money judgment in a civil case may have the effect of interfering with a defendant's ability to retain a criminal lawyer to defend against charges that are being pursued concurrently before another judge; but if the defendant never raises his Sixth Amendment problem before the judge in the civil case, it is unlikely to be error when that judge fails to consider it. But here Cook, even while acting pro se, flagged the issue repeatedly in the civil case, and the judge was obliged to expressly consider it when she made a ruling she knew would affect Cook's exercise of his Sixth Amendment rights in the parallel criminal proceeding.

In today's order dismissing the petition, the court places an unfortunate emphasis on the lack of any evidence "that either the State prosecutor or Judge Cutler had any intent to interfere with Cook's ability to hire private counsel or to deprive him of his Sixth Amendment rights," strongly implying that the lack of "any evidence that Judge Cutler acted *with intent to violate Cook's Sixth Amendment rights*" is critical to its decision.[75] This would indeed be a different case if the evidence supported that highly unusual scenario—a judge *intentionally* depriving a defendant of his constitutional rights. But such evidence would at least show that the judge *considered* the defendant's constitutional rights, which is what *Armstrong* at a minimum requires. And I am unaware of any authority, from this court or any other, that a constitutional deprivation in the trial courts is without remedy unless the State or

---

**73.** Today's order asserts that "Cook did little or nothing to flag the [Sixth Amendment] issue in the civil case," and that "[a]lthough Cook asserted that the entry of default made it impossible for him to hire an attorney in the *civil* case, he never asserted in the civil case that he could not afford an attorney in the criminal case." Order, ¶ 5 (emphasis in original). This strikes me as too artful a distinction given the unusual facts of this case. I do not accept, as the order does, that when the judge heard repeatedly from Cook in the civil case that he lacked the funds to hire a lawyer, she had forgotten that he anticipated using the same funds to hire a criminal lawyer, a fact central to the representation hearing over which she had presided shortly before. Cook's complaint was plainly about his inability to ac-

cess his funds to hire a lawyer *at all*, not just for the civil case.

**74.** *See United States v. Terry*, 449 F.2d 727, 728 (5th Cir.1971) (citations omitted) (holding that a defendant who is financially able to retain counsel and fails to do so within a reasonable time may be held to have waived the right to counsel of choice); *Lewis v. State*, 195 P.3d 622, 633 (Alaska App.2008) (concluding that a Sixth Amendment claim based on the lack of counsel during a psychiatric examination was waived on appeal for lack of briefing).

**75.** Order, ¶ 5 (emphasis added).

the court specifically intended that the constitution be violated.[76]

## C. A New Material Fact Requires Vacation Of The Conviction In the Interests Of Justice.

It is inconsequential that the erroneous ruling that interfered with Cook's Sixth Amendment rights occurred not in his criminal case but in the parallel wrongful death case. This is not a direct appeal from an erroneous ruling; this is a proceeding for post-conviction relief. Judge Smith properly positioned the case within the framework of AS 12.72.010(4), which provides for post-conviction relief upon a claim "that there exists evidence of material facts, not previously presented and heard by the court, that requires vacation of the conviction or sentence in the interest of justice." There is nothing about the statutory standard that requires the newly discovered "material facts" to have arisen in the criminal case itself; new trials may be justified by developments in cases that are completely unrelated.[77] Judge Smith held that this court's decision overturning the de-

fault judgment in Cook's civil case was a "material fact" that falls within the statute's terms, and I agree.

The question under AS 12.72.010(4) then becomes whether this "evidence of material facts" is such that it "requires vacation of the conviction ... in the interest of justice." This question is already answered in well-developed principles of constitutional law. The United States Supreme Court has held "that erroneous deprivation of the right to counsel of choice, with consequences that are necessarily unquantifiable and indeterminate, unquestionably qualifies as structural error."[78] Structural error means that "it is unnecessary to conduct an ineffectiveness or prejudice inquiry to establish a Sixth Amendment violation."[79] "When a court unreasonably or arbitrarily interferes with an accused['s] right to retain counsel of his choice, a conviction attained under such circumstances cannot stand, irrespective of whether the defendant has been prejudiced."[80] The remedy for structural error is automatic reversal and remand for a new trial.[81] The State conceded this below.

**76.** We certainly did not inquire in *Armstrong* whether the superior court's dismissal of the case as a discovery sanction, without expressly considering the effect of its discovery orders on the plaintiff's exercise of his Fifth Amendment rights, was intended to interfere with those rights; yet we vacated the dismissal and remanded the case for further proceedings. *See Armstrong v. Tanaka*, 228 P.3d 79, 85–86 (Alaska 2010). When reversing criminal convictions on constitutional grounds, this court never inquires whether the State or the trial court *intended* that the constitution be violated. *See, e.g., Adams v. State*, 261 P.3d 758, 760 (Alaska 2011) (holding that prosecutor's comments on defendant's invocation of his right to remain silent violated the due process clause); *Kalmakoff v. State*, 257 P.3d 108, 111 (Alaska 2011) (holding that admission of incriminating statements despite police officers' failure to honor defendant's invocation of his right to remain silent violated his Fifth Amendment rights); *Raphael v. State*, 994 P.2d 1004, 1006 (Alaska 2000) (holding that incarceration of reluctant victim to coerce her into testifying violated defendant's due process rights).

**77.** *See, e.g., Bell v. State*, 227 Ga. 800, 183 S.E.2d 357, 362 (1971) (holding that conviction of two other men for robbery for which defendant was also convicted, where "the uncontroverted evidence ... shows that only two principals were involved in the robbery," was material evidence that justified a new trial); *State v. Ellington*, 151 Idaho 53, 253 P.3d 727, 745–49 (2011) (holding

that police officer's inconsistent testimony in another case about science of accident reconstruction constituted "material evidence" justifying a new trial); *State v. Gookins*, 135 N.J. 42, 637 A.2d 1255, 1257–58 (1994) (holding that conviction of police officer for falsifying results of breathalyzer test in other cases justified new trials of drivers convicted in reliance on his testimony); *State v. Strahl*, 768 N.W.2d 546, 549–50 (S.D.2009) (holding that perjury convictions of state's witness in two unrelated cases constituted newly discovered evidence that justified a new trial).

**78.** *United States v. Gonzalez–Lopez*, 548 U.S. 140, 150, 126 S.Ct. 2557, 165 L.Ed.2d 409 (2006) (quoting *Sullivan v. Louisiana*, 508 U.S. 275, 282, 113 S.Ct. 2078, 124 L.Ed.2d 182 (1993)) (internal quotation marks omitted); *see also State v. Kates*, 426 N.J.Super. 32, 42 A.3d 929, 936–37 (N.J.Super.App.Div.2012) (citing other cases).

**79.** *Gonzalez–Lopez*, 548 U.S. at 148, 126 S.Ct. 2557.

**80.** *United States v. Collins*, 920 F.2d 619, 625 (10th Cir.1990) (citations omitted).

**81.** *See United States v. Stein*, 541 F.3d 130, 146–47 (2d Cir.2008) (dismissing indictment as only way to restore defendants to status quo ante after government interfered with employer's agree-

The court of appeals, in its decision reversing Judge Smith's grant of post-conviction relief, acknowledged the structural error approach but asserted that it "is premised on the assumption that the rule of structural error will have a deterrent effect—that it will cause judges to be extremely cautious whenever they are considering a ruling that will prevent a defendant from employing the attorney of [his] choosing in a criminal case." [82] The court of appeals continued:

> [T]his assumption makes sense only when (1) the challenged ruling is made by a judge who is aware of the effect that the ruling will have on the defendant's ability to employ [his] chosen attorney, and only when (2) the effect of the ruling on the defendant's ability to employ the attorney is a factor that is legally relevant to the judge's decision.[83]

The court of appeals concluded that the basis for the assumption did not exist here because "even though the superior court's ruling effectively prevented Cook from paying the attorney's retainer, this consequence was irrelevant to the court's decision—irrelevant to the question of whether Cook had demonstrated good cause for his failure to file a timely response to the wrongful death lawsuit." [84]

I find this analysis unconvincing. First, the purpose of the structural error rule is not deterrence; I am unaware of any authority that says it is. Rather, structural error is born of the need to correct an unfairness *to the particular defendant* that is pervasive but cannot readily be identified. As the Supreme Court explained in *Gonzalez–Lopez:*

Different attorneys will pursue different strategies with regard to investigation and discovery, development of the theory of defense, selection of the jury, presentation of the witnesses, and style of witness examination and jury argument. And the choice of attorney will affect whether and on what terms the defendant cooperates with the prosecution, plea bargains, or decides instead to go to trial. In light of these myriad aspects of representation, the erroneous denial of counsel bears directly on the "framework within which the trial proceeds,"—or indeed on whether it proceeds at all. It is impossible to know what different choices the rejected counsel would have made, and then to quantify the impact of those different choices on the outcome of the proceedings. Many counseled decisions, including those involving plea bargains and cooperation with the government, do not even concern the conduct of the trial at all. Harmless-error analysis in such a context would be a speculative inquiry into what might have occurred in an alternate universe.[85]

The purpose of the structural error approach, thus, is to correct a constitutional violation where harmless error analysis could not conceivably do so, thus ensuring that the defendant receives a fair trial. If at the same time it deters trial courts from committing constitutional error in the future, that is a great side benefit; but it is not the doctrine's purpose. Its purpose is corrective rather than prophylactic.

And even assuming that the structural error doctrine were premised on the assump-

ment to pay defendants' legal fees); *State v. Garcia,* 358 N.C. 382, 597 S.E.2d 724, 744 (2004) ("[A] defendant's remedy for structural error is not depend[e]nt upon harmless error analysis; rather, such errors are reversible *per se.*" (emphasis in original) (citing *Neder v. United States,* 527 U.S. 1, 8, 119 S.Ct. 1827, 144 L.Ed.2d 35 (1999))); *State v. Paumier,* 176 Wash.2d 29, 288 P.3d 1126, 1134 (2012) ("The remedy for structural error is automatic reversal and remand for a new trial." (citing *Neder,* 527 U.S. at 8–9, 119 S.Ct. 1827)). I recognize that the "interest of justice" requirement for post-conviction relief in Alaska has been interpreted to require both "that the proposed new evidence is newly discovered and [that it] would probably produce an acquittal." *Lewis v. State,* 901 P.2d 448, 450 (Alaska

App.1995). But the standard has not been interpreted in circumstances that would qualify as structural error; in such circumstances the statute would have to be interpreted to be consistent with *Gonzalez–Lopez* and other constitutional precedent.

**82.** *Cook II,* 265 P.3d 342, 347–48.

**83.** *Id.* at 348.

**84.** *Id.*

**85.** *United States v. Gonzalez–Lopez,* 548 U.S. 140, 150, 126 S.Ct. 2557, 165 L.Ed.2d 409 (2006) (citation omitted).

tion that it will deter, I cannot accept the court of appeals' explanation as to why the assumption does not apply in this case. First, the court of appeals states that deterrence can work only when "the challenged ruling is made by a judge who is aware of the effect that the ruling will have on the defendant's ability to employ [his] chosen attorney." [86] But as already explained above, the judge was surely aware of this effect in Cook's case. She presided over the parallel criminal proceedings in which Cook's need for the funds for Sixth Amendment purposes was pointedly asserted; and after she signed the default judgment, Cook complained to her repeatedly in the civil suit about his loss of funds and its effect on his ability to retain private counsel. The court of appeals cannot have meant to imply that the judge was actually unaware of the relevant facts, and of how events in the two cases impacted each other, when she denied Cook's motion to set aside the default judgment.

The court of appeals also concluded that the deterrent effect of the structural error approach could only apply when "the effect of the ruling on the defendant's ability to employ the attorney is a factor that is legally relevant to the judge's decision"; and in this case, "even though the superior court's ruling effectively prevented Cook from paying the attorney's retainer, this consequence was irrelevant to the court's decision—irrelevant to the question of whether Cook had demonstrated good cause for his failure to file a timely response to the wrongful death law-

suit." [87] Again, I disagree with the court's narrow depiction of the court's task under the circumstances. Default judgments are set aside "in accordance with Rule 60(b)." [88] On appeal in *Rowland* (assisted by capable counsel), Cook argued that he was entitled to relief under Rule 60(b)(1), which requires proof of "mistake, inadvertence, surprise or excusable neglect"—a standard he easily met.[89] In his motion in the superior court to set aside the default judgment, however, when proceeding pro se, Cook cited "Civil Rules 55(e) & 60(b)" but not any particular subsection, though he did rely on our case law regarding "excusable neglect." He also advanced the general proposition that "a trial on the merits is preferable to a default judgment" [90] and argued that he had meritorious defenses to both liability and damages.

The pleadings of pro se litigants are liberally construed.[91] Given that Cook was pro se, the superior court, in reviewing his motion to set aside the default judgment and having concluded (erroneously) that he was not entitled to relief under Rule 60(b)(1), should have gone on to determine whether he was entitled to relief under any *other* subsection of Rule 60(b).[92] And perhaps he was.

Rule 60(b)(6) allows relief from judgment for any reason justifying relief and not specifically mentioned in the first five subsections of the Rule. It requires that courts "balance the interest in the finality of judgments against the interest in granting relief from judgment when justice so requires." [93] Rule 60(b)(6) "should be liberally construed

---

86. *Cook II*, 265 P.3d at 348.

87. *Id.*

88. *Rowland*, 49 P.3d 262, 264 (Alaska 2002) (internal quotation marks omitted).

89. *Id.* at 264–65.

90. *Wright v. Shorten*, 964 P.2d 441, 444 (Alaska 1998).

91. *Sosa de Rosario v. Chenega Lodging*, 297 P.3d 139, 147 n. 23 (Alaska 2013) (citing *Khalsa v. Chose*, 261 P.3d 367, 372 n. 9 (Alaska 2011)).

92. *See, e.g.*, *Hicks v. Pleasants*, 158 P.3d 817, 820–21 n. 5 (Alaska 2007) (observing that defaulted pro se litigant's prompt explanation to

the court, during his divorce hearing, that he had not meant to stipulate to the values at issue could have been construed "as a request to set aside the default"); *DeNardo v. Calista Corp.*, 111 P.3d 326, 331 (Alaska 2005) ("A pro se litigant's interpretation of his own complaint need not be determinative of what it actually pleads; the court must exercise its independent judgment in determining what claims the complaint's words assert.").

93. *Norman v. Nichiro Gyogyo Kaisha, Ltd.*, 761 P.2d 713, 717 (Alaska 1988); *see also Harley v. Zoesch*, 413 F.3d 866, 870 (8th Cir.2005) ("Rule 60(b) ... 'attempts to strike a proper balance between the conflicting principles that litigation must be brought to an end and that justice should be done.'" (quoting 11 CHARLES ALAN WRIGHT ET AL, FEDERAL PRACTICE AND PROCEDURE § 2851, at 227 (2d ed.1995))).

to do justice where extraordinary circumstances demand it"; [94] a liberal construction is particularly required "with regard to default judgments." [95] Significantly, "[r]elief under Rule 60(b)(6) is governed by equitable principles." [96] These include "the prejudice, if any, to the non-moving party if relief from judgment is granted, whether any intervening equities make the granting of relief inappropriate, and *any other circumstances relevant to consideration of the equities of the case.*" [97] This open-ended instruction to consider "the equities of the case" plainly includes the interests of the movant. In *Norman v. Nichiro Gyogyo Kaisha, Ltd.*, this court held that "where two plaintiffs have suffered similar injuries as a result of the same acts committed by the same defendants, but have been treated differently because of an intervening change in the law, it is an abuse of discretion to deny relief under Civil Rule 60(b)(6)." [98] The determinative factor in *Norman* was yet another equitable one: "[t]he appearance of injustice, and the consequent undermining of public confidence in the judicial system" when one litigant receives "dramatically different treatment from [another] under identical circumstances." [99]

Here, the court of appeals was wrong to conclude that the only question before the superior court on Cook's motion was the narrow one of "whether Cook had demonstrated good cause for his failure to file a timely response to the wrongful death lawsuit." The question was the considerably broader one of whether justice required that the judgment be set aside, and relevant to that question was whatever evidence the court had of "any circumstances relevant to consideration of the equities of the case," including prejudice to the movant and the appearance of injustice. Cook's loss of the funds he needed to secure counsel of choice for his criminal defense—an issue repeatedly raised and of which the court was otherwise well aware—was most certainly such a cir-

cumstance. It may well not have tipped the equities in Cook's favor, but it should at least have been expressly weighed in the balance.

## III. CONCLUSION

Because Superior Court Judge Smith correctly granted post-conviction relief, and because the superior court's earlier failure to give due consideration to Cook's Sixth Amendment right to counsel of choice was structural error which compels the remedy, I would reverse the decision of the court of appeals and order a new trial.

---

**94.** *Norman,* 761 P.2d at 715 (citing *O'Link v. O'Link,* 632 P.2d 225, 230 (Alaska 1981)).

**95.** *O'Link,* 632 P.2d at 230 (citing *Livingston v. Livingston,* 572 P.2d 79, 85–87 (Alaska 1977)).

**96.** *Norman,* 761 P.2d at 715.

**97.** *Id.* at 717 (emphasis added).

